NOTICE
Decision filed 03/24/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220088-U

NO. 5-22-0088

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee. | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-1293 |
| | ) | |
| CALVIN T. WILLIAMS, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court did not err in allowing Detective Cherry to remain at the prosecutor's table for the duration of the trial and defendant failed to establish plain error regarding Detective Cherry's testimony, the hearsay testimony of Paula Moore, and the trial court's consideration of an improper sentencing factor. However, we remand for further *Krankel* proceedings.

¶ 2 Defendant appeals from his conviction and sentencing, raising several issues of appeal. For the reasons below, we affirm the conviction and sentence but remand for further *Krankel* proceedings.

¶ 3 I. BACKGROUND

¶ 4 On November 16, 2020, defendant was charged, by information, with first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) in that he personally discharged a firearm into a window at 610 E. Eureka, Champaign, Illinois, that proximately cause the death of Gerryontae Brown. The

1

information also stated that the sentencing range for such offense was 20 to 60 years' imprisonment and a mandatory 25-year add-on was applicable pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)).

¶ 5    On January 25, 2021, the State filed a motion to permit a witness to remain in the courtroom. The motion asserted that the State expected defendant would move to exclude witnesses for the duration of the trial. It thus requested the lead detective of the case, Detective Jody Cherry, be permitted to remain in the courtroom and sit at the prosecutor's table for assistance in the presentation of the State's case. In support, the State cited *People v. Miller*, 26 Ill. 2d 305 (1962), which stated there was a long-established custom to allow an officer to remain in the courtroom and held the defendant in that case did not suffer prejudice where the officer merely heard the occurrence witness testify before the officer's own testimony. *Id.* at 307. The State also cited *People v. Jones*, 108 Ill. App. 3d 880, 886 (1982), which instructed that "[a]bsent a showing of prejudice by the defendant, no abuse of discretion will be found in allowing a material witness to remain in the courtroom." The State argued that the presence of Detective Cherry in the courtroom during the presentation of its case would not prejudice defendant where Detective Cherry was not an occurrence witness, and the statements of the occurrence witnesses were previously recorded.

¶ 6    On February 9, 2021, the court held a hearing on the State's motion to permit a witness to remain in the courtroom. The hearing was a joint hearing with three other cases in which the State filed a similar motion requesting a detective remain in the courtroom. The State argued that Detective Cherry was not present at the shooting, was not an occurrence witness, and did not get involved until hours after the shooting. It further noted that Detective Cherry reviewed every report in the case and was expected to testify.

¶ 7    Defense counsel argued the cases upon which the State relied were Cook County cases and Cook County had a custom of allowing officers to remain in the courtroom. However, it was simply not the customary practice in Champaign County and never had been. Counsel contended the only exception to the exclusion of witnesses was that officers and proof of life witnesses were allowed to stay in the courtroom after they had testified, if they were not going to be recalled to testify. Counsel stated *Jones* was a Macoupin County case and was silent on whether or not it was the county's custom. Counsel indicated she was not concerned as much with fabrication of testimony but with the officer being given more credibility. She asserted she did not know the purpose of allowing Detective Cherry to sit at the prosecutor's table because the State failed to explain what assistance the officer would provide unless the officer would be whispering in the prosecutor's ear "certain things that he wouldn't be privy to do if he were sitting out in the hallway." Counsel further contended the State had an abundance of other people that could help present its case. She reiterated the State had not explained how Detective Cherry would assist other than bolstering the State's case and his own credibility by sitting at the prosecutor's table.

¶ 8    Defense counsel also agreed and adopted arguments presented by the other defense counsels in the three other cases presenting argument on the issue. The other defense counsels argued that allowing the detective to remain at the prosecution table would artificially enhance the detective's credibility and the detective's testimony would be colored by the testimony of all the other witnesses. Counsels expected the State would call the respective detectives as rebuttal witnesses to try to "clean up" what the defense accomplished in its case-in-chief. They also argued that the State had plenty of other options to help assist them in the presentation of the cases. Counsels also contended that all the State's authority was superseded by Rule 615. They further

3

argued that Rule 615 removed the court's discretion and now required the court to exclude all witnesses unless they met one of four exceptions listed in the rule.

¶ 9 In response, the State contended the cases could proceed without a detective sitting at the prosecutor's table, but the detectives would greatly assist in the prosecution's presentation. The State explained that the detectives would know the fact specific details of the case better than a prosecutor ever would "just like a defendant knows the facts of the case better than a defense attorney." It further stated the detectives would not be in uniform and Rule 615 did not eliminate the court's discretion. The court took the matter under advisement.

¶ 10 On February 10, 2021, the State filed a memorandum of law in support of its motion. Therein, the State argued, citing *In re N.F.*, 2020 IL App (1st) 182427, that Rule 615 did not eliminate the trial court's discretion under common law to allow witnesses to remain present in the courtroom. The State alternatively argued that Rule 615 allowed the State to designate a representative to remain present. It contended citing *People v. Neal*, 2020 IL App (4th) 170869, ¶ 75, that looking to case law regarding the Federal Rules of Evidence was appropriate because Rule 615 was modeled after the analogous federal rule. It asserted that several federal cases held that, under the analogous federal rule, the trial court may allow the State to designate an officer or case agent who may remain present at trial. *United States v. Charles*, 456 F.3d 249 (1st Cir. 2006); *United States v. Lee*, 834 F.3d 145 (2d Cir. 2016); *United States v. Gonzalez*, 918 F.2d 1129 (3d Cir. 1990); *United States v. Parodi*, 703 F.2d 768 (4th Cir. 1983); *United States. v. Robles-Pantoja*, 887 F.2d 1250 (5th Cir. 1989); *United States v. Engelmann*, 701 F.3d 874 (8th Cir. 2012); *United States v. Valencia-Riascos*, 696 F.3d 938 (9th Cir. 2012); *United States v. Butera*, 677 F.2d 1376 (11th Cir. 1982). It further asserted such was true even if the agent was expected to testify later on behalf of the government. *Gonzalez*, 918 F.2d at 1138; *Engelmann*, 701 F.3d at 877. In further

4

support, the State cited the Advisory Committee Notes to Federal Rule 615 (Fed. R. Evid. 615, Advisory Committee Notes, 1974 Enactment (quoting Sen. Rep. No 93-1277 (1974)), which provided that an investigative agent sitting at government counsel's table throughout the trial was a permissible exception to the rule of exclusion, as it was comparable to the situation in which defense counsel always had the client sitting at the defense table to consult during trial. The State acknowledged that this legal framework was not presented at the hearing on the State's motion and had no objection to allowing defense counsel to respond to the new authority.

¶ 11     On February 11, 2021, defense counsel filed a response. Counsel asserted that *Miller* and cases referenced therein (*People v. Chennault*, 24 Ill. 2d 185 (1962), and *People v. Dixon*, 23 Ill. 2d 136 (1961)) were cases from Cook County, which had a custom and practice that allowed police officers to remain in the courtroom during trial even if called to testify. She argued that those cases were silent as to whether or not those officers were also allowed to sit at counsel's table and assist the State in its presentation of the case. She stated while *Jones* was a Macoupin County case, the record in that case was silent as to the custom and practice for that county and whether the officer was allowed to sit at counsel's table to assist the State with the presentation of its case. Defense counsel argued that while this was the custom and practice in Cook County and federal courtrooms, it was not the custom and practice in Champaign County. Citing *United States v. Frazier*, 417 F.2d 1138 (3d Cir. 1969), counsel argued the best practice was to have the officer testify first, to avoid giving the prosecution an unfair advantage or the appearance that the prosecution was being favored. She expressed concern that Detective Cherry's presence at the prosecutor's table would add an air of credibility to his testimony that no other witness would receive and any special introduction of Detective Cherry as a member of the State's trial team or as an assistant in the presentation of the case would create further support for his credibility and an appearance of bias.

5

She further contended the case was not an old matter, complicated, or voluminous in nature, such that assistance was needed. Counsel found the State's analogy of Detective Cherry's presence at the prosecutor's table to defendant at defense counsel's table laughable because defendant was 18 years old and did not possess the same knowledge of the law or experience with the court system as Detective Cherry.

¶ 12 On February 23, 2021, the court entered an order, granting the State's motion to permit a witness to remain in courtroom. The court found the fact that there was no prior practice of having an officer in the courtroom during trial did not preclude the State from seeking such request. It determined—citing *People v. Jones*, 108 Ill. App. 3d 880 (1982), *People v. Chennault*, 24 Ill. 2d 185 (1962), and *People v. Nowlin*, 2015 IL App (4th) 130387-U—that defendant's concerns of witness influence, enhancement of witness credibility, and fundamental fairness, were all addressed and rejected by numerous courts absent a showing of prejudice. The court cited a rules committee comment in enacting the Rules of Evidence, which stated that "the Committee incorporated into the Rules of Evidence the current law of evidence in Illinois, whenever the Illinois Supreme Court or the Illinois Appellate Court had clearly spoken on a principle of evidentiary law within the last 50 years or so." The court also noted the committee comment that

> "[w]here there was no conflict with statutes or recent Illinois Supreme Court or Illinois Appellate Court decisions, and where it was determined to be beneficial and uniformly or almost uniformly accepted elsewhere, the Committee incorporated into the Illinois Rules of Evidence uncontroversial developments with respect to the law of evidence as reflected in the Federal Rules of Evidence and the 44 surveyed jurisdictions."

The court found that Illinois case law predating the Rules of Evidence continued to have precedential effect and Illinois courts had long permitted police officers to be in court absent a showing of prejudice to the defendant. The court acknowledged that Rule 615 had not been cited since the enactment of the Rules of Evidence but noted there were cases that discussed the same issues without citing Rule 615.

¶ 13 The court also cited the commentary to Illinois Rule 615 that was identical to the federal rule and thus federal case law was persuasive authority on the Illinois counterpart. Because the State failed to detail how Detective Cherry would be so essential in coordinating witnesses, managing evidence, or otherwise assisting the State, the court declined to find that Detective Cherry was permitted to remain in the courtroom during trial under Illinois Rule of Evidence 615(3) (eff. Jan. 1, 2011) ("a person whose presence is shown by a party to be essential to the presentation of the party's cause" may be exempted from witness exclusion). However, it found Rule 615(2) had been applied to include police officers and other agents in charge of investigations. The court discussed *United States v. Adamo*, 882 F.2d 1218 (7th Cir. 1989), which held that an investigative agent was exempted from sequestration and may be designated to sit at the government counsel's table although he was also a witness. It also discussed *United States v. Berry*, 133 F.3d 1020 (7th Cir. 1998), which stated it failed to see how the federal practice permitting a case agent to testify against the defendant after hearing other testimony was objectionable. The court determined based on extensive federal case law reviewed, the State had the ability, as a non-natural party, to designate a representative, who may be an investigative agent.

¶ 14 On September 14, 2021, counsel filed a motion *in limine* under Illinois Rule of Evidence 404 to admit evidence of Gerryontae Brown's prior violent conduct. Specifically, defense counsel requested admission of digital images and videos from Gerryontae's personal cell phone depicting

him possessing firearms, Gerryontae's prior conviction for mob action in 2019-JD-147, and the 19 counterfeit $20 bills located in Gerryontae's pocket.

¶ 15    On October 8, 2021, the court held a hearing on defendant's motion. After the court heard the parties' arguments regarding defendant's motion *in limine*, the court denied the motion regarding Gerryontae Brown's previous charge for mob action and the fact that counterfeit bills were in his pockets. However, regarding the photos of Gerryontae Brown holding guns, the court found if any witness testified "I don't think the victim ever held a gun, I've never seen him with a gun, I've never seen him in photographs with guns, he's never talked about guns, [or] anything to that level," defense counsel could impeach such witness with the photographs. The court warned if the defense "went down that road," it might open the door for the State to admit photographs of defendant with guns in its rebuttal. After discussing other matters, defense counsel averred there was a motion to exclude all witnesses. The State had no objection, except for allowing the victim's mother to remain in the courtroom after she provided her testimony. Counsel had no objection to allowing the victim's mother to remain in the courtroom after her testimony as long as she was instructed not to discuss anything she heard with any other potential witness.

¶ 16    Defendant's jury trial began on October 19, 2021. The victim's mother, Latesha Lee, testified first. She stated that Gerryontae Brown was her son, and his nickname was "Tae-Tae." On November 12, 2020, Gerryontae was living with her and her other children. Latesha further testified that Paula Moore was a close friend and Gerryontae referred to Paula as his aunt or "TT Paula." On cross-examination, Latesha testified that James Mann was staying at her house the week of November 12, 2020.

¶ 17    Dajon Lee next testified, stating that he was 13 years old and the brother of Gerryontae Brown. He lived with Gerryontae, and the rest of his family, at 610 East Eureka. Dajon stated that

8

on November 12, 2020, he, Gerryontae, Armon, Deshawn, Abe, their cousins, Bryan and Jay, and their sister Ahlyrik were at his house. Everyone was upstairs, except he and Abe, who were playing basketball outside. Eventually, he and Abe came inside to make food; then Abe went back outside to get his bike to leave. When Abe went outside, the neighbor said there were two people, one of which had a gun, in the backyard. Abe relayed the message to Dajon, and Dajon told everyone upstairs. Dajon stated that at that time, everyone—except his sister—went outside through the front door and around to the back. Dajon testified that when he went outside, he saw two people dressed in black, standing to the right on the sidewalk. Dajon testified that everyone went back inside and upstairs but then everyone started running outside the front door and around to the back again. Gerryontae was first to run out and Dajon was last. Dajon said when he was about to turn the corner of the house, he heard a gunshot and Gerryontae told everyone to go back into the house. Everyone went inside to the upstairs, but Gerryontae went downstairs and was calling people on his phone, saying defendant was shooting at him. At that time, Dajon and Bryan were on the stairs, trying to get Gerryontae to go back upstairs. Bryan then went upstairs, and Dajon went downstairs to sit on the couch. Dajon testified that Gerryontae went into the bathroom while on the phone, and when he came out of the bathroom, Dajon heard six or seven gunshots come from outside the kitchen window. He and Gerryontae then went upstairs. When Gerryontae got to the top of the stairs, he said, "D***." They went into their brother Kam's room and Gerryontae fell to the floor. Dajon testified that he had already called the police when the first shot happened. Dajon stated that his mom had cameras at their residence. Dajon then identified the people shown in the videos taken from the kitchen cameras in State Exhibit Nos. 4A1, 4B1, 4D1, 4E1, and 4F1.

¶ 18    On cross-examination, Dajon testified that when they went outside the second time, he did not know if the two guys were out there, but his brother thought they were. Dajon believed that

9

during the second time outside, Gerryontae made it just to the back of the house before Dajon heard the gunshot. Dajon clarified that during the second trip, he heard someone say "oh, yeah" then heard a bang. He again stated that he called the police once they all went inside and upstairs, and called a second time when his brother collapsed on the floor upstairs.

¶ 19     Dajon further clarified that there was a fence separating his house from the house to the west. A chain link fence ran from the front of the houses to the back then a brown wooden fence separated the backyards. The wooden fence went east, across the backyard to the park, which was to the east of his east neighbor's house. He stated the wooden fence had a gap in it right before the yard of his neighbor to the east. Dajon stated that he saw people go through that gap to get to the park and heard people refer to the gap as a shortcut. On redirect examination, Dajon clarified that it was not his brother's voice that he heard yell when he went outside the second time before the first bang sound occurred.

¶ 20     The State next called Ibrahim Aykal, who testified that he was a good friend of Gerryontae. He clarified that he also went by the name "Abe." Abe testified that on November 12, 2020, he was playing video games with Gerryontae, Armon, and Deshawn in Gerryontae's room. Abe stated that he rode his bike to Gerryontae's house and left it behind the house, near the air conditioner. At some point that day, he played basketball with Gerryontae, Deshawn, Armon, and Kam. Abe planned to leave and waited outside to be picked up, but that person did not show up, so Abe returned to the house. Abe testified that a neighbor called Gerryontae and told him there were two kids outside, so everyone went outside through the front door. When Abe went outside, he saw two people at the back fence of Gerryontae's backyard. Abe testified that he did not know one of the people because they had a mask on, but he knew the other person as Calvin. Abe stated that Calvin used to be friends with Gerryontae and Abe had hung out with Calvin once at Gerryontae's

10

house. Abe further testified that he would be able to identify Calvin if he saw him again. When asked if he saw Calvin in the courtroom, Abe stated, "No, ma'am."

¶ 21 Abe testified that when they were outside, one of the people shot a gun and they all ran back inside and locked the front door. Abe did not know which of the two people shot the gun. Gerryontae called his mother when they got back into the house. Abe testified that everyone was going up and down the stairs that were located right inside the front door. Abe was headed up the stairs when he heard gunshots again and ran upstairs. He did not see anything when the shots were fired but heard kitchen window break. Abe testified that once he got upstairs, everyone ran into the room and Gerryontae fell to the ground. Abe called 9-1-1 and the other people in the room put pressure on Gerryontae's bullet wound.

¶ 22 Abe testified that he did not see Gerryontae, or anyone else in the house, with a gun at any time that day. Abe stated that when the police arrived, he heard more gunshots, but the shots sounded further away. He also testified that no one left the house before the police arrived.

¶ 23 On cross-examination, Abe clarified that the neighbor, Shimaya, called Gerryontae through FaceTime while everyone was upstairs. He also stated that when they went outside the first time, they made it to the back of the house before the two people "creeped up off" the fence. Abe could not remember if it was dark outside. He stated there were no lights in the backyard or by the fence. Abe testified that Dajon did not play basketball with the rest of the people early that day because Dajon was with his friend. Dajon came home right after they were done playing basketball. Abe stated that Gerryontae also spoke with Shimaya through a window after the first gunshot. Abe clarified that everyone only went outside one time. Abe remembered someone yelling at him while he waited outside for someone to pick him up, but he could not remember who was yelling or whether the yelling came from Shimaya's house. He further clarified that no one at Gerryontae's

11

house fired back at the people. Abe did not recall telling officers that he could not physically see into the backyard because access to the windows was blocked.

¶ 24    Kamrion William then testified, stating that he is also referred to as "Kam" and he was Gerryontae's brother. On November 12, 2020, he lived at the Eureka Street house with his mom and family. Around 5 p.m., he was not at home, but he received a call from Gerryontae a little after 5 p.m. At that time, Gerryontae told him that "Calvin" was shooting at him. Kamrion identified defendant as Calvin and stated that defendant had lived with them before. Kamrion stated that defendant and Gerryontae used to be friends and defendant came to their house multiple times. After Gerryontae hung up, Kamrion headed back home. Within minutes, Kamrion's cousin, Byran, called him from Gerryontae's phone and said that Gerryontae had been shot.

¶ 25    On cross-examination, Kamrion stated there were three rooms upstairs. Two of the rooms were to the left of the stairs and had a window to the backyard. He denied that the view out the window was obstructed due to painting being done in the room. Kamrion stated that Gerryontae called and asked Kamrion to come home and look to see if there were people outside. Then, Gerryontae called again to say someone was shooting at him.

¶ 26    Armon Mapson testified that he was Gerryontae's best friend and knew defendant. Armon stated that on November 12, 2020, around 5 p.m., he, Gerryontae, Gerryontae's little brother and sister, and Deshawn were at Gerryontae's house. At that time, Gerryontae said he got a text, and they all went outside then came back inside. Armon did not see anything when he went outside. Once back inside, Gerryontae got up and went outside again and everyone followed. Armon stated that when he turned the corner of the house, someone shot at them. Armon said he knew it was a gunshot because of the sound. He did not see who shot at them. They all then ran inside, upstairs and then went downstairs to check that all the windows were closed. Armon went into Gerryontae's

12

mother's room on the first floor and headed to her bathroom to check the window. Before Armon got to the bathroom, more shots were fired. Armon also heard glass break. He and Gerryontae then ran upstairs and Gerryontae dropped to the floor when they got into the room. Armon stated that he did not observe Gerryontae, or anyone else in the house, with a gun that day. Armon did not hear any more gunshots that day.

¶ 27 On cross-examination, Armon testified that Abe was also at the house on November 12, 2020. Armon stated that Gerryontae did not get a phone call before they went outside the first time and only received a text message. Before they went outside the second time, Gerryontae was on the phone. Armon did not hear Gerryontae talk to anyone through the window. He agreed that James Mann was also at the house that night. He also agreed it was dark outside, and he could not see in the dark very well. Armon stated that Gerryontae saw someone with a ski mask, but Armon did not see anything. Armon testified that no one from his group shot back at whoever was shooting at them. Armon stated that he knew there was some dispute between defendant and Gerryontae regarding money and that he told defendant that Gerryontae did not take his money. After that conversation, Armon believed everything was fine between defendant and Gerryontae.

¶ 28 The State next called Shimaya Harris to testify. She stated that she was Gerryontae's neighbor to the east. Her house was the last house on the street before Douglass Park. The park is located in front of Eureka Street and is wrapped around to the east of Shimaya's house. Shimaya testified that on November 12, 2020, she was waiting outside the front of her house for a friend when she saw two people wearing all black walking down Sixth Street, which was the block to the west. The people walked onto a path in the park and eventually walked toward Shimaya's house on a park path to the east of her house. When they walked closer to her house, Shimaya could tell they were both males, but she did not recognize them. Shimaya believed the males were Hispanic.

13

She saw the people go behind the shed in her backyard. She watched for a minute to see if they would come out, but they never did. Shimaya stated she then went inside to make a pizza for her brothers and went upstairs to call out the window to ask Gerryontae if the males were his friends. She testified that she could not call Gerryontae because she did not have Wi-Fi to call him through Facebook Messenger. After Shimaya spoke to Gerryontae through the window, he closed the window and went outside. Shimaya saw another person go outside with Gerryontae, but she could not remember who. When Gerryontae went outside, he stopped in his front yard and looked toward the park, but by the time Shimaya called out to him again, he had already run back inside.

¶ 29    Shimaya testified after some time, she took the pizza out of the oven and saw the two males were back on the path in the park to the east on the side of her house. She stated that one of the males had a gun. Shimaya could not get Gerryontae's attention but a kid from Gerryontae's house was walking between Gerryontae and Shimaya's houses. Shimaya did not know the kid's name but said he was white, and she had seen the kid at Gerryontae's house before. The kid was looking around and walking toward the backyards. Shimaya told him not to go back there because there were two people with a gun and the kid said he was going to get Gerryontae. Shimaya stated the kid went into Gerryontae's house. Then, Gerryontae and another person went into her backyard by her trampoline and yelled out asking who was back there. Shimaya heard someone say "yeah" and heard one gunshot. Shimaya testified that people then started running and she heard noises downstairs like something banging on her back door. Shimaya went to look for her phone and looked out of the window. She saw one of the males run behind Gerryontae's house and the other run on the side of his house. Shimaya then heard two more gunshots. After she heard the gunshots, she found her phone and called the police. As the police pulled up, Shimaya heard more gunshots which sounded like they came from down the street.

14

¶ 30    On cross-examination, Shimaya stated that while she was waiting for her friend, she also saw Dajon and Abe, who was white, playing basketball in the cul-de-sac in front of her house. She testified that she did not recognize the two masked males with the gun. Shimaya testified that the white kid whom she warned about the armed people were behind the house was Abe. She knew Gerryontae was one of the people who went to the backyard for a second time because she heard Gerryontae's voice when he asked if anyone was back there. Shimaya testified that she did not need Wi-Fi to call 9-1-1. Shimaya did not know of any older male living at Gerryontae's house at that time. Shimaya testified that while she heard something at her door after the gunshots, she did not see anyone trying to get into her house. She clarified she was not looking out of the window when the shots were fired and did not know what happened in the backyard. On redirect examination, Shimaya recalled telling officers in her interview after the shooting that one of the males was wearing black Air Force I shoes and the other male was wearing white shoes with blue stripes.

¶ 31    Deshawn Brown next testified, stating he was Gerryontae's best friend. On the afternoon of November 12, 2020, Deshawn was playing basketball with Gerryontae, Abe, BJ, Armon, and Kam. After they were done playing basketball, they all went inside to play video games in Kam's room. Deshawn stated that someone came upstairs and told them that someone was trying to come into the house. They all went outside to the front yard. Deshawn said they did not see anyone, so they went back inside . After a few minutes, Gerryontae got a text message, and they all went back outside and walked toward the back of the house. Everyone who was playing video games was outside at this point, but Kam had already left the house. Deshawn testified that while he was in the backyard, Gerryontae started running toward him and he heard shots, so he started running. Deshawn clarified that he heard the gunshot while he was standing in the driveway then started

15

running. He ran inside, upstairs to Kam's room. Deshawn explained that Kam's room window faced Shimaya's house. Deshawn testified that when he looked out of the window, he saw defendant. He stated defendant was a friend of Gerryontae and Deshawn hung out with defendant a few times. He last saw defendant a few weeks prior to this incident. Deshawn testified that he did not see a second person with defendant. Deshawn said he stayed upstairs and Gerryontae went downstairs. Then, he heard gunshots coming from outside downstairs and Gerryontae ran upstairs and passed out. Deshawn stated that he did not see Gerryontae with a gun.

¶ 32    On cross-examination, Deshawn agreed that Gerryontae had an Uncle Jay who was at the house at that time. Deshawn clarified that Uncle Jay was the person who interrupted the group playing video games to tell them people were in the backyard. He also testified that when the group went outside for the first time, he did not know if anyone went into the backyard. Deshawn said that Gerryontae read the text message that he received before the group went back outside for the second time. The text message was from Shimaya. Deshawn stated that when Gerryontae went outside the second time, he went out toward the shed and Deshawn was right behind him but did not go farther than the driveway. Deshawn testified that he did not see or hear Gerryontae talk to Shimaya through the window. Nor did he hear Abe come in and say there were people outside. Deshawn again said that he did not see anyone in the backyard besides the people he was with and defendant.

¶ 33    Na'Bria Carter-Williams testified next, stating she was Gerryontae's girlfriend and that a little after 5 p.m. on November 12, 2020, she received a FaceTime phone call from Gerryontae. He told her that Calvin had shot him. Na'Bria knew of Calvin but had never met him. She was not aware of any disagreements between Gerryontae and Calvin. The phone call abruptly ended, and

16

she tried to call back multiple times but never talked to Gerryontae again. She did not know how often Gerryontae and Calvin hung out.

¶ 34 The State then called Kimora Douglas, who testified that she was defendant's girlfriend on November 12, 2020, and at the time of trial. Kimora knew Gerryontae and met him once when she and defendant first met at Gerryontae's house. At that time, defendant and Gerryontae got into an argument because defendant was missing money and accused Gerryontae of taking it. Kimora testified that defendant did not appear angry about the missing money and was not worried about it. She stated that Deshawn and another guy were also in the room during the argument. Kimora stated that defendant and Gerryontae did not remain friends after the argument. Kimora stated on November 12, 2020, defendant was living with his friend who went by the name of "Double 0." She did not know anyone named Whitfield Harris. She testified that defendant never attempted to look for Gerryontae after their argument.

¶ 35 Kimora testified that she remembered the police interviewed her on November 14, 2020. She also remembered, in the interview, telling officers that defendant went looking for Gerryontae on a couple occasions and on one occasion defendant hid in some bushes near Town Center. Kimora testified that she did not buy a gun for defendant but did give defendant money for his birthday, on October 23, 2020, and he bought a gun that had camouflage all around. Defendant told her he bought the gun for a music video. Kimora testified that after he bought it, she never saw defendant without the gun. Kimora spoke with defendant around 2 p.m. on November 12, 2020, and he told her he was going to make some money at "The End." Kimora explained that a music studio was at "The End," which is located by Douglass Park. Despite trying to contact defendant multiple times, Kimora did not speak with defendant until 2 a.m. on November 13, 2020.

17

Kimora stated that she met with the prosecutor in preparation for trial and defendant asked Kimora what was discussed but she did not tell him about their conversation.

¶ 36 On cross-examination, Kimora testified that defendant lost his money at Gerryontae's house on August 17, 2020. The next day, August 18, 2020, defendant received half of his lost money back. Kimora testified that defendant did not hold a grudge over the money. Kimora stated defendant "let it go" and just decided not to be friends with Gerryontae. She testified that she did not personally observe defendant hiding in the bushes at Town Center but a guy from her work told her that defendant did so. Kimora stated that during her conversation with defendant on November 12, 2020, they got into an argument because she told him to stop taking Xanax. She remembered telling officers that defendant also took Percocet. Kimora stated that the pills made defendant black out and act differently.

¶ 37 On redirect examination, the State asked if Kimora remembered telling officers that defendant was no longer mad about the money but was instead mad at the disrespect that Gerryontae showed defendant. Kimora stated that she did not remember saying that. Kimora agreed that she told officers that the pills made defendant act different, but did not mention that they also made him black out. She also agreed that defendant did not take the pills often.

¶ 38 The State next called Officer Austin Massey to testify. Officer Massey stated that he was working as an officer for the City of Champaign, Illinois, on November 12, 2020. On that day, at 5:17 p.m., he responded to a reported shooting at 610 Eureka Street. Officer Massey testified that it took him about five minutes to arrive at the scene and upon arrival, he discovered the victim on the floor of the southeast upstairs bedroom. Officer Massey performed medical assistance until the other officers and the EMTs arrived and relinquished the victim to the EMTs. Officer Massey testified that he then spoke with Lakesha and Bryan. Officer Massey stated Bryan paced and

18

appeared scared during their conversation. At one point, Bryan took off his sweatshirt. Officer Massey's interaction with Bryan lasted about five minutes. Officer Massey testified that he asked Bryan about an altercation outside, and Bryan stated that they were heading outside to go to the store when the neighbor told them there were people behind the house. Bryan further stated that as they headed to the store, they came up to "the cut," and a subject jumped out and fired one round at the group. The group then ran into the house. As they were running, Bryan heard more gunshots and that was when Gerryontae was hit. Officer Massey testified that Bryan indicated the subject was a mixed-race male with a hoodie tied around his face. Bryan told Officer Massey that the shots came from outside and it sounded like a .22 gun.

¶ 39   On cross-examination, Officer Massey agreed that Bryan said that the neighbor sent the group outside. Officer Massey did not believe Bryan indicated who had left to go to the store. The officer did not know where "the cut" was located. Officer Massey stated that Bryan said he only saw one person. The officer also agreed that Bryan stated that the neighbor told the group that the people behind the house put a gun behind the shed.

¶ 40   Sergeant James Warren testified next, stating that he was a patrol sergeant for the City of Champaign Police Department. He stated that he was also a member of the Champaign Police Department Firearms Cadre and a master firearms instructor. Sgt. Warren testified that he was dispatched to 610 Eureka Street as a patrol officer on November 12, 2020, at about 5:23 p.m. When he arrived, there were already several officers at the scene. He went inside the home to the southeast bedroom where he observed the victim receiving medical attention. Shortly thereafter, he began conducting interviews. While conducting his interviews, Sgt. Warren was informed that more gunshots were being fired in the area. He conferred with other officers who reported they heard more rounds being fired from approximately a block to the north of the crime scene. Sgt.

19

Warren did not complete the interviews. Instead, he went a block north—where the second shooting was reported—but did not locate any witnesses or evidence of a shooting. He returned to 610 Eureka Street and began working as a crime scene technician. Sgt. Warren identified State's Exhibits 5-1 through 5-99 as copies of the crime scene photos that he took. The State then admitted the exhibits into evidence.

¶ 41    Sgt. Warren stated the pictures showed that the ground was heavily laden with leaves from an inch to seven inches or more deep in various areas behind the two residences. Sgt. Warren testified that Exhibit 5-12 showed the back of the 610 Eureka residence which had a kitchen window on the lower floor, air conditioning unit, and a bicycle. He further stated that there was an area of interest below the window. The window had broken glass and a perforated screen. Sgt. Warren testified that there were multiple holes in the screen. The holes were in an area of about two to three inches diameter circle. Given this, Sgt. Warren testified that either the shooter was very close to the window screen or a very gifted shooter could have shot further back and still maintained that type of small shot grouping.

¶ 42    Sgt. Warren found a spent shell casing on top of the leaves in between the bicycle and air conditioning unit. Given the number of holes on the screen, Sgt. Warren used a metal detector to try to locate more shell casings. Sgt. Warren found eight shell casings at the foundation of the house near the kitchen window. Sgt. Warren testified that there was a rim at the bottom around the outside edge of the shell casings which was indicative of a .22 long rifle. He stated it was likely the rounds were fired from essentially the same area because all of the rounds landed in close proximity to each other. Sgt. Warren testified that they had to move the leaves in order to find the shell casings, but they did so slowly. While it was possible the casings moved, they would not have moved significantly. Sgt. Warren stated there was no broken glass on the exterior of the home

and whatever damage was caused indicated the rounds went inward into the residence as opposed to coming out. No evidence was found outside of the home that indicated somebody inside was shooting towards the outside. Sgt. Warren also testified that some of the exhibits showed projectile perforations throughout the interior of the house and in the front door. He stated there was bloody clothing on the stairwell that was not there when he first arrived at the scene and believed EMS likely had to cut clothing off the victim and it fell when they were leaving the residence.

¶ 43    Sgt. Warren testified that he found four projectiles in the house and the victim was struck with two projectiles. The State noted that eight shell casings were found outside and asked if Sgt. Warren would expect to find all of the projectiles under normal circumstances. Sgt. Warraen replied, "Under most circumstances, no." He explained that some projectiles completely disintegrate to the point of not being recoverable once they terminate into a surface. It was also possible that the projectiles perforated through a wall and fell in the hollows between the wall partitions, as well as any number of other reasons. Sgt. Warren testified that he never looked into all of the drawers in a house without a search warrant unless it was suspected that evidence was in the drawers. He found no firearms during his search of the premises.

¶ 44    On cross-examination, Sgt. Warren stated that he metal detected the entire yard and not just under the kitchen window. He did not use the metal detector by the gap in the fence, the driveways, or the path in Douglass Park. Sgt. Warren verified that he did not find any casings other than the ones found under the kitchen window. He stated that he personally used the metal detector in the portion of the yard by the shed. Officer Wendt used it under the kitchen window, and several other officers used it throughout different sections of the yard. Sgt. Warren testified that his search of the house was limited to items in plain view and he did not look for firearms that were not in

plain view. On redirect examination, Sgt. Warren clarified that he did not obtain a search warrant for the entire house.

¶ 45    Paula Moore testified next. She stated that Gerryontae was her nephew. She clarified that he was not her biological nephew but she knew his family his entire life and was "active" with Gerryontae since he was four or five years old. Paula testified that she also knew defendant through her children. Defendant had eaten and stayed at her house and had also recorded music in the recording studio in her house. She said she was one of the first people Gerryontae would contact if he had any problems. She testified that she, her children, and Gerryontae would be one of the first people defendant would contact if he was having difficulties in life.

¶ 46    The State asked if Paula was aware of a disagreement between Gerryontae and defendant, and defense counsel objected for hearsay. The court overruled the objection. Paula stated she was aware of a conflict between defendant and Gerryontae's friend, Carlos. She said defendant and Gerryontae told her about a disagreement they had about money. Paula testified that defendant told her that money went missing when he stayed at Gerryontae's house, and he believed it was stolen. Paula said that defendant never directly said who he believed took the money. Gerryontae told Paula that defendant's girlfriend was with him when his money went missing. Paula testified that Gerryontae also told her that defendant flashed a green camo .22 at Gerryontae, using either FaceTime or Snapchat, and that defendant uploaded several videos of him shooting several different guns. Defense counsel objected based on hearsay and the court instructed counsel to rephrase the question. The State asked, "After [Gerryontae] came to you and told you about these threats the Defendant was making to him did you have a conversation with the Defendant?" Paula stated she did have a conversation with defendant. The State asked what she said during this conversation, and defense counsel objected for hearsay. The State then asked what defendant said

22

during the conversation. Paula stated she confronted defendant on November 8, 2020, and defendant told her that he bought a gun for protection from Gerryontae. Paula stated that defendant only expressed being worried about a physical altercation and "never expressed anything about gunplay or gun involvement." Paula said she told defendant that Gerryontae did not have a gun and had not spoken of harming defendant. When asked if defendant disagreed with her, Paula stated that defendant did not say a lot but there was no direct disagreement.

¶ 47 Paula testified that on November 12, 2020, Gerryontae FaceTimed her a little after 5 p.m. She said he was out of breath, anxious, and panicked. At that time, Gerryontae told her that defendant shot at him. Paula said she instantly hung up and called defendant through Facebook but he did not answer. She then sent a text message through Facebook, and he never responded. Paula then video called Gerryontae back, but Dajon answered his phone. She saw Gerryontae lying on the bed. He was not moving or breathing.

¶ 48 On cross-examination, Paula stated that her conversations with Gerryontae and defendant about the missing money occurred within a month of this incident. She testified that she knew Gerryontae did not have a gun because he spent a lot of time with her and confided in her. Paula stated she did not spend much time with Gerryontae's friends.

¶ 49 The State next called three police officers from Michigan: Road Deputy Angela Baggett from the Berrien County Sheriff's Department, Detective Sergeant Nathan Adamczyk from the City of Niles Police Department, and Detective Sergeant Ian Dodd from the Berrien County Sheriff's Department. Their testimonies revealed that around 10 a.m. on November 13, 2020, defendant and Whitfield Harris were driving in a red Pontiac G6 with Illinois license plates that was reported stolen from Mielle West. Whitfield was the driver and failed to stop after Officer Baggett attempted to stop the car. After a car and foot chase, defendant was apprehended in Niles,

23

Michigan. Whitfield was later found in the rafters of a pedestrian's garage in Niles, Michigan, after a three-hour search ensued.

¶ 50    Officers found identification cards, a social security card, and a black satchel bag containing .22 ammunition on defendant's person. During his interview with Deputy Baggett, defendant said that he was going to his mom's house in Springfield, Michigan, which was about two hours from where defendant was apprehended. Defendant stated that the ammunition was from a shooting at his uncle's house.

¶ 51    After further information concerning a firearm was provided to Sergeant Dodd, police retraced the steps from where the vehicle pursuit ended to where defendant was apprehended. While retracing the steps, they found a Walther P22 semiautomatic pistol inside a trash can in a parking lot in Niles, Michigan. The Walther P22 semiautomatic pistol was loaded with .22 long rifle caliber ammunition. The firearm was in very poor condition, which indicated it was exposed to the elements. Detective Dodd identified State's Exhibit 15 as the firearm he retrieved on March 10, 2021, and explained it was cleaned up by the evidence lab.

¶ 52    On cross-examination, Detective Dodd stated that the standard magazine for that firearm would hold at least 10 rounds, but he did not know the capacity for the magazine that was retrieved. He also did not know how many rounds were in the magazine when he collected it. Defense counsel asked if the officer would normally package the ammunition as evidence and count it to know the amount of rounds. Detective Dodd said he normally would but did not in this case. When counsel asked the detective to look at the photograph of the magazine, he stated there were at least four rounds in the magazine.

¶ 53    The State next called Douglas Michael Wendt, a police officer for the Champaign Police Department, to testify. Officer Wendt stated that on November 12, 2020, he was dispatched to 610

24

Eureka Street as a crime scene technician. He stated there were six to eight projectile holes in the kitchen window on the north side of the house. Officer Wendt discovered eight .22-caliber shell casings outside below the kitchen window by using a metal detector and shifting the leaves by hand. He collected and bagged those shell casings as evidence. Officer Wendt stated the officers also used the metal detector to check around the shed due to reports of a shot being fired in that area, but no shell casings were found. He testified that there were two cars parked at the back of 610 Eureka; however, the cars were covered in so much dust and leaves that it was obvious the cars had not been disturbed. Officer Wendt identified State's Exhibits 6 through 12 as seven of the shell casings he recovered outside the house. The State admitted the exhibits into evidence.

¶ 54    Officer Wendt testified that he used basic black print powder to process the air conditioner unit and the bicycle that was below the kitchen window but did not develop any ridge detail or fingerprints on those objects. A ridge detail was developed from the kitchen windowsill. Officer Wendt testified that the sliding glass door was damaged or bent, so he processed the handle in case someone attempted to enter the home. He developed ridge detail or fingerprints inside and outside the handle area. Officer Wendt explained he referred to prints as ridge detail when he was unsure whether it was a fingerprint or palmprint. Officer Wendt and another officer searched the shed but found nothing of evidentiary value.

¶ 55    Officer Wendt testified that in March 2021, Detective Jody Cherry gave him a box containing a Walther P22 .22-caliber handgun and a magazine that was fully loaded with 10 .22-caliber bullets. Officer Wendt identified State's Exhibit 15 as the gun, magazine, and bullets received from Detective Cherry. Officer Wendt testified that at Detective Cherry's instruction, he processed the gun. He did not develop any fingerprints from the gun. Officer Wendt testified that another officer fired the gun using the police department's .22-caliber ammunition to create test

25

fire shell casings and the markings on the test fired shell casings matched the markings on the shell casings found under the kitchen window at 610 Eureka Street on November 12, 2020.

¶ 56    On cross-examination, Officer Wendt testified that he did not search the yard in front or to the west or to the east of the shed. He stated the area west of the shed was searched by someone else, but he did not recall who did so. Counsel showed Officer Wendt State's Exhibits 5-6 through 5-10, and Officer Wendt testified he saw a dark shape of something under the tree in the backyard of 610 Eureka Street. He stated he did not search in or under that item.

¶ 57    Doctor Shiping Bao, a forensic pathologist, testified that on November 13, 2020, he performed an autopsy on Gerryontae. During his autopsy, he discovered two bullets in Gerryontae; one was in the center of his chest and the other was in the back of his head. Dr. Bao testified that he could not determine how far away the shooter was from the victim. He stated that the bullet in Gerryontae's chest went downwards from the left to right between the second and third ribs, and between the two lungs through the ascending aorta—which was the largest artery in the body. Dr. Bao testified that one could move and run after their aorta was punctured with a bullet and believed such person could run up a set of stairs. He estimated Gerryontae would survive a few minutes. Dr. Bao stated the bullet in the back of Gerryontae's head went about one inch under the skin upwards from the left to right and back to front. He further stated there was no injury to the skull or brain. Dr. Bao testified the shot to the chest was fatal. He stated the cause of death was the gunshot wound to the chest due to being shot by another. He further stated that no medical intervention could have been administered to save Gerryontae's life.

¶ 58    Vickie Reels, a forensic scientist for the Illinois State Police Forensic Sciences Command at the Springfield laboratory, testified next. She stated that she specialized in firearms. Reels testified that in January 2021, she received the bullet from the shooting in this case, marked as the

26

State's Exhibit 6. Several months later, she also received a firearm, marked as the State's Exhibit 15. Reels stated that the serial number on the firearm had been scratched off. In order to make a comparison, Reels used laboratory ammunition and completed five test fires. She noted there was a reproduction among the test shot and then two test shots were selected to compare with the bullet in the State's Exhibit 6. She stated this was the standard procedure in her field. Reels testified that after her comparison analysis, she concluded that the firearm in the State's Exhibit 15 fired the casing in the State's Exhibit 6.

¶ 59 On cross-examination, Reels agreed that a firearm like a P22 had interchangeable parts, including the barrel and the firing pin. She also agreed that changing out parts would affect the marks made on a bullet. Reels stated that she used the firing pin mark to make her identification and that she did not use any of the extractor or ejector marks. She agreed that it was fair to say that her conclusion was that the same firing pin struck the bullet and not necessarily the same handgun.

¶ 60 The State next called Whitfield Harris to testify. Whitfield stated he was incarcerated since November 13, 2020, and had charges in Cook County for escape and possession of a stolen motor vehicle. He testified that before he was taken into custody, he lived with his girlfriend, Mielle, in Champaign, Illinois. He stated his nickname was "Double 0." Whitfield testified that on November 12, 2020, defendant lived with him and Mielle. He met defendant through work at Freddy's Custards two to three weeks prior to defendant living with him. Whitfield stated that on November 12, 2020, sometime between 1 and 3 p.m., he and defendant went to buy weed from one of defendant's friends. They then went back to their home and smoked the weed. Whitfield stated they decided to buy more weed and took a bus to buy more from a different friend. Whitfield was unsure where the bus dropped them off but stated they started walking towards the friend's house when they got off the bus. He testified that they did not buy more weed because when they were

27

walking, defendant told him that there were going to go to another friend's house. Whitfield stated they ended up in the backyard of someone's house. Whitfield was not familiar with the area, so he was not sure where they were or the address. He estimated it took about 45 minutes to an hour to arrive at the backyard from where they were dropped off. When they got to the backyard, defendant told Whitfield that there were people inside the house who were defendant's friends or people defendant knew.

¶ 61 Whitfield testified that he did not know what was going on at that point and believed they were just meeting up with one of defendant's friends. Using the map that the State provided, Whitfield stated they were in the backyard of the second house to the left of Douglass Park on Eureka Street. Whitfield stated they did not have to hop the fence in the backyard because there was a cut in the fence that they crawled through. He believed he stood back there for 5 to 10 minutes. Defendant then told Whitfield that he saw some people, and defendant and the people started cursing back and forth. Whitfield testified that the people then started moving around and some of the people went inside the home. Whitfield stayed at the back of the property and defendant moved closer to the back of the house. At that time, everyone else was back inside the house. Defendant went toward the sliding glass door and window of the house and looked into the window. Whitfield testified that at that point he saw defendant pull something from his hip and fire shots into the window. Whitfield heard five or six shots. Whitfield was unsure if anyone in the house fired back at defendant because he turned around and started running towards Douglass Park when defendant shot inside the house. Whitfield stated he did not hear any gunshots before defendant fired into the window. Whitfield testified that defendant also started running and they ran a block before they started walking and ended up back at their own house.

28

¶ 62    Whitfield stated that during their walk home, defendant had a normal attitude as if nothing happened. Whitfield told defendant that he was upset with him because defendant put Whitfield on the radar when he already was in trouble in Cook County. Defendant never apologized and told Whitfield to "stop tripping." Whitfield testified that defendant found out Gerryontae died when they arrived at their house, and defendant acted normal when he found out. At some point, someone called and warned defendant that people knew he shot Gerryontae, and he needed to get away from Champaign. So, Whitfield and defendant took Mielle's car—a red Pontiac—and left for Michigan. Whitfield stated that they planned on staying in Michigan for a while. He also stated that defendant never told Whitfield that he was afraid of Gerryontae. Whitfield testified that he did not have a gun that day and did not know what defendant's gun looked like.

¶ 63    On cross-examination, Whitfield testified that he was offered immunity in regard to the events on November 12, 2020, for testifying at trial. He agreed that he gave two interviews with the police in Michigan and did not say much in the first interview. It was only after he received immunity that he provided more information. Whitfield did not remember going to the Illinois bus terminal on November 12, 2020. He testified that they arrived at the bus station around 4 or 5 p.m. He also did not remember walking on the path in Douglass Park. He did not see anyone on the front porch of 612 Eureka Street and did not see anyone playing basketball. Whitfield stated that he did not hide out behind the shed. Whitfield testified that when the group ran outside of the house, he saw four or five people. It took the people 5 to 10 minutes to notice he and defendant were by the fence. Whitfield stated that defendant first yelled at the people. Whitfield did not remember telling the police that the people talked then yelled at defendant first. He also did not remember telling police that once the people started cursing, they started moving around, going in and out of the house. Whitfield agreed he did not observe the people go into the house but assumed

29

they did since they were no longer outside between the houses, and he saw people moving around in the house. Whitfield stated that defendant never announced that he was going to go to the house to shoot someone. However, when they left their house, defendant was on the phone, mad about something. When they were walking after the shooting, defendant seemed mad to Whitfield. Whitfield confirmed that he did not know defendant had a gun until he went up to the kitchen window of the house and started shooting.

¶ 64    Whitfield testified that when the people and defendant were cursing back and forth, it sounded threatening. When the people were in the house, Whitfield saw someone peeking through the kitchen window but did not see anyone at the glass sliding door. When defendant went up to the house, Whitfield could see someone in the back of that room through the window. Whitfield did not remember telling police that when he was running away, he felt like someone was shooting at him. He denied his immunity impacted the change from his statements to the officers to that at trial. Whitfield agreed that he felt like his life was in danger. He remembered telling officers that defendant seemed nervous after finding out that he killed someone but denied that he said defendant was jumpy and scared.

¶ 65    On redirect examination, Whitfield stated that when the people went back into the house, the yelling stopped. Whitfield testified that he told defendant that he had cut off his GPS bracelet. He stated that he would have not gone with defendant if defendant had told him he intended to shoot someone. Whitfield testified that he remembered Detective Cherry and spoke with him the prior Monday. He stated they discussed his immunity agreement. Whitfield agreed that Detective Cherry stated the only way Whitfield could mess up his immunity agreement was to not tell the truth during his testimony.

¶ 66    On recross-examination, Whitfield agreed that his memory of the events on November 12, 2020, would be better on November 13, 2020, than at the trial. Whitfield agreed he was taking Xanax in November 2020 but denied taking Xanax on November 12, 2020. Whitfield testified he did not smoke weed every day and took one Xanax a month because he did not want to test positive on any drug tests for work.

¶ 67    On redirect examination, Whitfield confirmed he had been in custody since his arrest on November 13, 2020, and was not under the influence of any drugs. He stated he had not taken Xanax since November 2020.

¶ 68    The court then read three stipulations. The first stipulated that State's Exhibit 26 was the forensic download from Gerryontae's phone and State Exhibits 26A and 26B were the reports of the download of Gerryontae's phone. In the second stipulation, the parties stipulated to the admission of State Exhibits 26, 26A, and 26B. The parties also stipulated to the admission of State's Exhibit Group 4 (4A through 4g), which contained surveillance footage from various areas around Gerryontae's house from about 4:30 p.m. to 5:30 p.m. on November 12, 2020. In the third stipulation, the parties stipulated to admission of State's Exhibit 23, which was Mass Transit Bus video surveillance from November 12, 2020.

¶ 69    The State then called Detective Jody Cherry to testify. Detective Cherry stated that he was the case agent for the shooting of Gerryontae. He explained that a case agent is in charge of coordinating everything, reviewing all the reports, and coordinating with the state's attorney to help the prosecution. In this case, Detective Cherry conducted several interviews, reviewed all the reports including crime scene and lab reports, and obtained several search warrants. Detective Cherry testified that he had been in the courtroom during the entire trial and his presence would not impact his testimony. He agreed that everything in his testimony consisted of things that would

31

either be present in a report or address other evidence admitted at the trial. Detective Cherry testified that James Mann was not subpoenaed because he was last told James lived in Texas and he did not have a reliable address for him.

¶ 70 Detective Cherry was shown State's Exhibit Group 26. He testified that State Exhibit 26A was the call log section of Gerryontae's phone records. Detective Cherry explained that the records showed a unique identifier for Snapchat so there was no way of knowing who calls were from in Snapchat unless Gerryontae had the Snapchat user saved. According to the records, Gerryontae FaceTimed Kamrion three different times lasting from 7 seconds to 30 seconds at 5:03 p.m., 5:05 p.m., and 5:08 p.m. Gerryontae answered a call through Snapchat at 5:07 p.m. for 50 seconds, but the detective did not know who made the call. An unanswered call from Shimaya occurred at 5:10 p.m. Kamrion FaceTimed Gerryontae at 5:12 p.m. Gerryontae FaceTimed Paula at 5:13 p.m. and that call lasted for 30 seconds. Gerryontae FaceTimed his girlfriend, Na'Bria, at 5:15 p.m. and that call that lasted for 24 seconds. Gerryontae twice rejected FaceTime calls from Na'Bria a few seconds later. Gerryontae called his mom, Latesha, at 5:16 p.m. and that call lasted 1 minute and 15 seconds. At 5:17 p.m., Gerryontae called 9-1-1. A FaceTime call to Gerryontae's phone occurred at 5:19 p.m. that lasted for 14 seconds, but Detective Cherry could not verify who owned that number and, based on Detective Cherry's memory, that number did not show up any other time on November 12, 2020. A FaceTime call from Paula was answered at 5:19 p.m. and lasted for 20 seconds. Detective Cherry testified that any further calls went unanswered, and the police obtained the phone shortly thereafter.

¶ 71 Detective Cherry stated there were two cameras inside Gerryontae's home, one inside Latesha's bedroom and the other capturing the kitchen area. He explained that when the camera detected motion, it started to record and would stop after 30 seconds even if there was still motion

32

occurring. Detective Cherry testified that there was no relevant video inside the bedroom. The State showed Detective Cherry a still photograph taken from the kitchen surveillance (State's Exhibit 4A1) and asked if he recollected Dajon previously identifying the person in the photograph as Abe. Detective Cherry answered affirmatively. After reviewing the clip beginning at 5:03 p.m. (the State's Exhibit 4), Detective Cherry testified that Abe asked if they saw people outside because they heard a noise and Abe walked into the kitchen, empty-handed, and walked back out with a knife.

¶ 72    Detective Cherry identified Gerryontae as the individual in State's Exhibit 4B1. He started the second clip of the kitchen (State's Exhibit 4B) which began at 5:06 p.m. and showed Gerryontae walking around the kitchen table and looking out the back window blinds with a phone in his hand. Detective Cherry stated Gerryontae also had some type of cable, like a charging cable or headphones. Detective Cherry testified that he reviewed this video several times and never saw Gerryontae with a gun. The detective stated someone asked for a description of the two people in the backyard, and someone replied that they were about Gerryontae's age. Detective Cherry said the third video (State's Exhibit 4C) began at 5:09 p.m. and showed someone walking briefly in and out of the camera range but that the audio of this clip was important. He testified that he could hear Gerryontae speaking with a male on the phone, saying he got word from Shimaya. He could also hear Abe saying he was going outside to get his bike. The detective explained the video cut off in the middle of the talking due to the video stopping after 30 seconds.

¶ 73    Detective Cherry stated the fourth video (State's Exhibit 4E) began at 5:11 p.m., and he heard a loud bang, possibly a gunshot, and could see Dajon sprinting away from the kitchen. The fifth video (State's Exhibit 4E) began at 5:13 p.m. Detective Cherry could hear Gerryontae in the video talking to someone recounting the events. Gerryontae stated "they're in the back and then

33

they raise up and blow." Gerryontae also said "TT," which indicated to Detective Cherry that Gerryontae was speaking with Paula. Detective Cherry testified based on his 20-plus years of experience, "blow" meant to shoot.

¶ 74    Detective Cherry testified that the sixth video (State's Exhibit 4F) began at 5:14 p.m. and showed Armon talking on the phone saying that whoever was outside used to sleep at the house. The detective stated that in all of the clips they had reviewed at that point, it was very clear no one had a gun.

¶ 75    Detective Cherry testified that the seventh video began at 5:22 p.m., which was approximately five minutes after the first 9-1-1 call. The video showed that the blinds on the kitchen window were impacted and no longer flat. He stated he could also see red and blue lights reflecting on the couch and table, indicating the police had arrived. In the video, he also heard a male scream that his cousin was gone.

¶ 76    Detective Cherry testified he was made aware that defendant was in custody in Berrien County, Michigan, on November 13, 2020. The same day, he and Detective Miller traveled to the Berrien County Sheriff's Department. He stated at that point, defendant was a suspect in the homicide of Gerryontae. Once he arrived at the Berrien County Sheriff's Department, he conducted a video and audio recorded interview with defendant.

¶ 77    The State then played the video of defendant's interview. At the beginning of the interview, Detective Cherry asked if defendant was okay or under the influence, then asked defendant of his whereabouts the day prior, November 12, 2020. Initially, defendant stated he did not remember what he did on November 12, 2020, due to taking a Xanax. After stating several times, he was not sure what happened, defendant eventually claimed he shot Gerryontae in self-defense.

34

¶ 78    Detective Cherry testified that he recognized State's Exhibit 25 as the drawing of Gerryontae's house that Detective Miller provided to defendant during the interview. He stated that during the interview, defendant indicated that he fired the gun through the sliding glass door. Detective Cherry stated he asked defendant several times at the beginning of the interview if he was okay because when he first met defendant, he appeared sleepy or lethargic. Kimora also told Detective Cherry that defendant took a Xanax the day before. Detective Cherry testified that based on his training and experience, he believed defendant was able to continue with the interview. He also stated based on defendant's statements, police reports, and police officers' body cams, there was another unrelated shooting that occurred in the area about 20 minutes after the report of the shooting at Gerryontae's. Nothing came of that investigation. Detective Cherry stated that all the minors, as well as Bryan Raymond and James Mann, were still at the scene of the crime when the unrelated shooting occurred.

¶ 79    Detective Cherry stated during his trip to Michigan, he received an item of defendant's property which included a bunch of bullets. He identified State's Exhibits 14A, 14B, and 14C as photos of the sock full of bullets that was recovered from defendant. Detective Cherry stated that in State's Exhibit 14C, he could see "REM" stamped on the head of one of the bullets, which stood for Remington, a bullet manufacturer. He testified there were eight shell casings recovered from defendant's sock, and some were stamped with Remington and some were stamped with the letter C.

¶ 80    Detective Cherry testified that during the interview, defendant stated that his gun was in a neighborhood between Fourth and Fifth Streets in Champaign, Illinois. Nothing was located in that area after the police conducted two separate searches. Detective Cherry stated that during his investigation, he determined defendant and Whitfield took a bus. He identified State's Exhibit 23

35

as the surveillance retrieved from the Mass Transit District. Detective Cherry stated the video had a time stamp of 4:08 p.m. on November 12, 2020. He also identified State's Exhibit 31 as the surveillance video of defendant and Whitfield before they got onto the bus. On that video, you can see Whitfield is wearing white shoes with a very distinctive blue line that wrapped around the side and toe and defendant was wearing black shoes.

¶ 81    Detective Cherry identified State's Exhibit 26B as another report from Gerryontae's phone, which generated the contacts including his social media accounts. The report included a Facebook account associated with Gerryontae. The user and account name from Gerryontae's Facebook was "Javon Brown." Detective Cherry stated that each Facebook account had a unique identification number. Based on the identification numbers associated with Gerryontae and defendant's Facebook accounts, Detective Cherry discovered a Facebook message conversation between Gerryontae and defendant, dating back to May 23, 2020. Detective Cherry stated from May 23, 2020, until August 16, 2020, defendant and Gerryontae regularly communicated through Facebook and the nature of those conversations were friendly. The records also showed that there were phone calls between the accounts. Detective Cherry testified that the records showed that on August 20, 2020, at 9:30 p.m., Gerryontae attempted to video chat defendant, but defendant did not answer. The next message the same day was from Gerryontae, saying "D***, gang. Yo really feel like I got yo sh***." Defendant responded asking Gerryontae "you know where it is at." Gerryontae responded, "huh." Eventually, Gerryontae told defendant that he was going to clean his room and a few messages later Gerryontae said to defendant, "I found it, fo." Detective Cherry stated this exchange showed that Gerryontae cleaned his room to look for defendant's money and found the money. The next message was from defendant asking where Gerryontae found the money. Then, there was a missed video chat, defendant sent a question mark, and another missed video chat.

36

Gerryontae responded that he found the money on the side of the mattress. After that exchange, there was a video chat between them on August 22, 2020. Then, on three different dates, Gerryontae sent a message asking defendant if he was off, asking if defendant worked, and asking if defendant had a "rillo," which Detective Cherry suspected was an abbreviation for cigarillo. Detective Cherry said there were no responses to any of those messages and there was no further contact on Facebook messenger between defendant and Gerryontae.

¶ 82    On cross-examination, Detective Cherry testified there were no Ring camera clips from 5:15 p.m. and 5:21 p.m. on November 12, 2020. He was unsure whether the insides of the two cars behind 610 Eureka Street were searched. Detective Cherry agreed that 610 Eureka Street was not searched for guns. When asked if he received any consent to search or a search warrant to search 610 Eureka Street, Detective Cherry stated that there was consent by the homeowner to process the home, which meant to collect all the evidence.

¶ 83    On redirect examination, the State asked why 610 Eureka was not searched. Detective Cherry stated, "Because there was no indication at the time of the shooting that would indicate that there was shots being returned or any reason to actually search that home." Detective Cherry testified that he first learned there was some allegation of returning fire from the house in his interview with defendant on November 13, 2020. Detective Cherry said, however, defendant specifically referenced that the cops were already there so there was no reason to think anything else. Detective Cherry stated the next time he heard there was potentially return fire was four months later when Detective Cherry interviewed Whitfield. The State asked why Detective Cherry did not get a search warrant at that time, and he said that he would not be able to get a search warrant four months later because the likelihood of that evidence still being there was nonexistent. Following Detective Cherry's testimony, the State rested.

¶ 84    Defense counsel moved for a directed verdict. The court denied the motion, finding that considering the evidence in a light most favorable to the State that a reasonable trier of fact could conclude defendant was guilty.

¶ 85    Defense counsel called Detective Cherry as the first witness for the defense. Detective Cherry testified that he interviewed Whitfield Harris on November 13, 2020, and March 10, 2021. Detective Cherry stated the second interview occurred after he contacted the state's attorney to ask for immunity for Whitfield because he did not believe Whitfield had any direct involvement based on defendant's statements and other factors. Detective Cherry agreed the immunity agreement basically required Whitfield to provide a truthful statement to Detective Cherry and testify truthfully. Detective Cherry stated that he did not have any reason to believe Whitfield was untruthful during his March 10, 2021, interview. Detective Cherry agreed there were some inconsistences between Whitfield's testimony and his statements on March 10, 2021.

¶ 86    Detective Cherry stated that in his interview, Whitfield said that defendant was asleep in the apartment when Whitfield got home from work on November 11, 2020, and they were up until the "wee-hours of the morning." Detective Cherry agreed that Whitfield also stated in the interview that the people from the house yelled at defendant first, which was the opposite of his testimony. When asked whether Whitfield said something other than no one shot back at defendant at his interview, Detective Cherry stated, "Well, further into the statement there was some elaboration I think that led to his testimony yesterday." Detective Cherry also stated the elaboration provided later in Whitfield's interview also explained why Whitfield stated, in his interview, that he saw what appeared to be a gun with someone from the group of people but testified that he never saw anyone in the group with a gun. Detective Cherry agreed that while Whitfield testified that he could not remember if he took any drugs, he stated he used drugs on November 12, 2020, in his

38

interview. During this line of questioning, defense counsel played clips of Whitfield's interview to demonstrate what he said at that time.

¶ 87    On cross-examination, Detective Cherry testified that the shortened clips did not provide context. He explained that later in the interview when they were discussing the guns, he asked Whitfield if he had already turned around and starting running, and Whitfield answered affirmatively. Later, when they were discussing the shots being fired, Detective Cherry asked Whitfield "if he thought it was a weapon because as he was running away he heard shots." Detective Cherry then testified:

"So his brain's processing all of this and so he said in his mind that he thought— that's why he said he thought it might have been a gun earlier is simply because he heard shots when he was running away, not that he saw anything that looked like a gun. It was just his mind extrapolating that."

¶ 88    Defendant testified that he was 18 years old and would turn 19 years old on October 23. He met Gerryontae before the summer of 2020 through a friend, Donnell Douglas. They also worked together at Portillo's. Defendant said that he hung out with Gerryontae multiple times a week and would occasionally stay at his house. Defendant stated that they had a falling out when defendant's money came up missing while he was at Gerryontae's house. Defendant testified that Gerryontae returned half of the missing money to him the same day it went missing. Defendant also said that he got money back at a later occasion, which was the subject the Facebook messages discussed earlier at trial. Defendant testified that he did not hold a grudge against Gerryontae for the missing money. Defendant denied waiting for Gerryontae in bushes at the Town Center Apartments. He agreed that he felt disrespected over the money situation, stating he felt like he could not trust Gerryontae after that. From that point, he quit hanging out with Gerryontae, but he

39

did not want to kill Gerryontae over the money. Defendant further stated that he also got into a dispute with Gerryontae's friends, which made it more difficult to hang out with him. Defendant explained that he got into a fight with Carlos, who said things to girls about defendant behind his back. When he fought with Carlos, Deshawn and some others held defendant back and he got jumped. Defendant clarified that Gerryontae did not participate and stood back. Defendant testified that he did not hold any ill will towards Gerryontae for that, but it further cemented his desire to no longer hang out with Gerryontae.

¶ 89 Defendant agreed that he and Gerryontae went to Paula with their problems. He also agreed Paula was like an aunt or a mother figure to him. Defendant testified that Paula was a mediator between him and Gerryontae. Defendant denied ever making threats to Gerryontae over the money or any other time. Defendant testified that he received threats. He stated, "After the situation that happened after I had got in a fight with Carlos, Carlos and Armon were saying things like they were looking for me and when they catch me this and that. Things like that."

¶ 90 Defendant stated he was familiar with the cut in the fence behind Gerryontae's house. He and others used the cut a lot as a shortcut between the houses and the park. He agreed in November 2020, he was taking Xanax without a prescription a couple times a month. He also took Ecstasy occasionally, meaning a couple times a month, and used cannabis every day. Defendant stated when he took Xanax he tended to forget things and not have a clear recollection of everything. He agreed that he and Kimora argued over the fact that he took Xanax.

¶ 91 Defendant testified that he met Whitfield at his apartment complex, Town Center, when Whitfield was looking to buy weed at the end of the summer in 2020. They both worked at Freddy's for about a month or two. Defendant said he stayed with Whitfield at Town Center and stayed there the night before the shooting. Defendant stated they smoked weed on November 12,

2020, and took a Xanax after the shooting occurred. On November 12, 2020, defendant decided to sell weed to make some money, and he and Whitfield were going to sell weed together. So, they left Town Center Apartments and got on a bus. Defendant said they already had the weed to sell. Eventually, they got to the Illini bus terminal and waited for 30 minutes before they got onto another bus to go to the north end of town. Defendant testified the north end of town was often referred to as "The End" and was near Douglass Park. Defendant explained they went to The End because they were not able to sell much of the weed at the terminal. Defendant said there was no other purpose in going to The End other than selling weed. Defendant did not recall getting off of the bus at Romine and Eads. He also said that they never walked around Douglass Park. Defendant testified that after not being able to sell a lot of the weed in an area in The End, they decided to try the park. On their way to the park, they used the shortcut through the cut in Gerryontae's fence. Defendant agreed he was wearing all black that day. He denied traveling down Sixth Street and taking the path in the park. He also agreed that he had a gun in his possession for protection because he had been robbed on that side of town in the summer of 2020. Defendant stated that he did not go to Gerryontae's house to confront Gerryontae or any of his friends. Defendant denied hanging out in the backyard for 15 to 20 minutes. Defendant testified that he knew Shimaya Harris and he never tried to gain access to her home. He also denied trying to gain access to Gerryontae's home.

¶ 92    Defendant testified that when they went through the cut in the fence, five or six people were in the driveway between 610 and 612 Eureka Street. Defendant testified that those people had weapons and were reaching on their sides. He said the people were also pointing and yelling at him and Whitfield and then began approaching them. Defendant said once the people began approaching them, he pulled out his gun and shot in the air to scare them. He testified that some people ran toward the front of the house and some ducked behind the cars in the driveway, so he

41

ducked behind a car. Defendant believed it was going to be a shootout. When counsel asked why defendant did not run away, defendant stated, "Because there were more of them than there was of me, and I did not want to get shot or chased down and shot."

¶ 93    Defendant testified that he approached closer to the house and there were still people on the side of the house ducking behind cars and he saw movement inside the house through his peripheral. He said it was starting to get dark at that point and there were lights on inside the house. Defendant looked through the window and saw a lot of movement and saw a shadow with what looked like a gun. He thought they were going to shoot him through the window, so he shot at them first. When counsel asked why he shot through the window, defendant replied that he did not want to get shot. Defendant agreed that he was not trying to kill Gerryontae or anyone else. He said he wanted to stop approaching the window and duck or get out of the way. Defendant testified that after he fired through the window, the gun jammed, and he started to run. He went back through the cut in the fence.

¶ 94    Defendant estimated he fired the gun between six and eight times. As he ran away from the house, defendant heard gunshots that were louder than his. He believed the people who were at Gerryontae's house were shooting back at him. Defendant stated he and Whitfield ran a little way then started to walk and went to the bus station. He believed he got back on the bus at Romine and Eads. He did not remember where he got off the bus. Eventually, he got back to his apartment, and when he did, he started seeing on his phone that Gerryontae had died. Defendant testified that he had no idea whether he shot anyone at 610 Eureka Street. When defendant discovered Gerryontae was dead, he asked Whitfield to take him to another friend's house because he did not think it was safe there because he thought someone would come back to retaliate. Defendant stated

that he did not go over to The End on November 12, 2020, to cause any harm to or fight with Gerryontae. He again stated he did not harbor any resentment against him over the Carlos situation.

¶ 95    On cross-examination, defendant confirmed that the gun discovered in Michigan was the same gun he shot on November 12, 2020. He agreed he never thought the gun would be found. He stated he did not report when he got robbed in the summer of 2020. He stated that he attempted to find a gun on Facebook in February 2020, agreed that was before the robbery, and that the robbery did not prompt him to want a gun at that time. Defendant also agreed that he had done legal research at the law library and had said on multiple phone calls that he knew the law. Defendant stated that he understood what was required to prove second degree murder. He agreed when he was interviewed by Detective Cherry, he did not know what he needed to say to be able to show second degree murder. The State asked whether defendant told Detective Cherry that the police were already there when individuals were shooting back. Defendant responded, "I could see lights and hear sirens." Defendant testified that he was mistaken when he told Detective Cherry that he saw Gerryontae fall to the ground after he shot his gun. He clarified that he only saw a silhouette falling to the ground.

¶ 96    Defendant stated that he was very good friends with Gerryontae and other individuals in the house. Defendant testified that he was not sure how many people he saw moving in the house before he fired the gun, but it was more than one. Defendant stated that three or four people were still outside when he saw people walking around inside the house. Defendant testified that he believed he saw Armon with a gun and Deshawn and BJ acting like they had guns. He said Armon, Deshawn, and BJ were still outside when he shot his gun. Defendant agreed that he did not tell Detective Cherry about people being outside with guns during his interview. The State asked, "If you went looking for Tae-Tae to try to kill him you wouldn't tell us that; would you?" Defendant

replied, "No. I wouldn't. I—" The State then asked if defendant had any doubt that he got off the bus at Romine and Eads even if he did not remember, and defendant said he did doubt that because he never got off the bus at that stop.

¶ 97    Defendant testified that he never saw Deshawn go into the house. He said he remembered the Blink surveillance clip that showed an individual wearing a black hoodie, but he was unsure who that individual was because you could only see half of the body. When the State asked if the person in the video had on a black hoodie, defendant answered affirmatively. Defendant testified he was not sure who was wearing a black hoodie on that day. The State asked if defendant could tell someone had a gun but could not remember what that person was wearing. Defendant said a lot of them were acting like they had guns. Defendant testified that Gerryontae had guns in his brother's room in a thing in the wall that you could pull out.

¶ 98    Defendant agreed that Detective Cherry's testimony regarding the Facebook account messages between him and Gerryontae before August was truthful. Defendant agreed that he was upset and crying in his interview. When the State asked if defendant ever told Detective Cherry that he was sorry for killing Gerryontae, defendant said "that doesn't mean I wasn't." Defendant remembered telling Detective Cherry that he fired his gun through the patio door. He agreed those statements were not true. Defendant stated that it was hard for him to think back in the interview because he had not slept in hours and it was traumatic. Defendant testified that his memory was better now because he had time to sober up. When asked if the drugs made him forget things for a certain period of time and he remembered them later, defendant stated that the drugs made him kind of hazy for a short period of time. Defendant was not sure if he or Detective Miller first raised self-defense in the interview. Defendant said that he did not see Carlos at Gerryontae's house.

¶ 99    On redirect examination, defendant testified that he did not buy a gun in February 2020 or August 2020. He said he had only had his gun for a short period of time before this happened. Defendant agreed that Detective Cherry convinced him that he shot through the window based on where the shell casings were discovered. The defense rested.

¶ 100   The jury found defendant guilty of first degree murder. It also found that defendant personally discharged a firearm that proximately caused death to Gerryontae Brown.

¶ 101   On November 17, 2021, defense counsel filed a motion for acquittal, or in the alternative, motion for a new trial. Counsel argued that the State failed to prove defendant guilty beyond a reasonable doubt. She further argued—*inter alia*—the court erred in denying defendant's motion for a directed verdict, granting the State's motion to permit Detective Cherry to remain in the courtroom, allowing the State to admit photos of defendant possessing or displaying handguns, and allowing Paula Moore to testify as to hearsay evidence.

¶ 102   On November 22, 2021, defendant filed a *pro se* letter to the court. In the letter, defendant asserted—*inter alia*—that counsel was ineffective for failing to call James Mann, who would have testified that he heard more than one shooter, and failing to file a motion to suppress defendant's statements on the basis that he was denied an attorney during his interview with Detective Cherry.

¶ 103   The court held a hearing for posttrial motions and sentencing on December 8, 2021. At the beginning of the hearing, the court stated that it needed to address defendant's *Krankel* claims raised in his November 22, 2021, letter. The court said that defendant was claiming defense counsel was ineffective during trial for not calling Mann who would have testified that he heard more than one shooter. Defendant added that the police report showed that Mann told the police that he heard more than one shooter and could tell the difference by the way the shots sounded. Defendant told the court that he spoke with defense counsel about this and requested that she call Mann as a

45

witness. Defendant was not sure when he spoke with defense counsel about this but stated it was before trial.

¶ 104   The court stated the next issue was defense counsel was ineffective for failing to file a motion to suppress defendant's statements. Defendant added that in his interview, Detective Cherry ignored his request for an attorney and therefore his statements after that point should have been suppressed. Defendant stated that he spoke with defense counsel about this, and she told him that she would not file a motion to suppress on this basis because she was just going to have defendant say it at trial.

¶ 105   The court asked defendant if there were any other details about those issues or any other issues that he wished to claim, and defendant stated that his attorney also fell asleep during trial when the State was questioning a witness. Defendant believed defense counsel fell asleep when the State was questioning either the coroner or one of the police officers from Michigan. Defendant said that he observed her sleeping with her eyes closed and he had to nudge her awake. When the court asked if defendant talked to her about that, defendant stated that he may have but did not recall exactly what was said.

¶ 106   The court then asked defense counsel about defendant's claims. In addressing the claim that defense counsel failed to call Mann as a witness, defense counsel stated based on her reading of the police report and Mann's indication that he believed there might have been more than one shooter, she did not believe Mann would add to the strategy they had for trial. Defense counsel said she spoke with defendant about this in detail. When asked about the failure to file a motion to suppress based on defendant asking for an attorney, defense counsel said that she filed a motion to suppress and then withdrew it after speaking with defendant and deciding that he would testify at trial. Defense counsel explained that she could not suppress a statement that defendant would then

testify about and that she explained this to defendant in great detail. The court then asked defense counsel about falling asleep, and defense counsel stated that defendant's complaint referred to when his videotaped statement played and not during live testimony.

¶ 107   The court then asked defendant if there was anything else he wanted to say, and defendant raised an additional issue that defense counsel failed to show pictures of Gerryontae with guns for evidence on his behalf. Defense counsel said that it was a strategic decision based on the court's ruling that such evidence would open the door to show similar pictures of the defendant with guns to the jury. She stated she determined that was probably not in his best interest.

¶ 108   The court denied defendant's *Krankel* claims. It found failing to call Mann as a witness was a matter of trial strategy. The court found defendant's claim that counsel failed to file a motion to suppress was a matter of trial strategy and lacked merit because defendant would testify to the statements that he wanted suppressed. The court also found that counsel's failure to present pictures of Gerryontae with guns was a matter of trial strategy based on the court's statements. When discussing defendant's claim that counsel fell asleep, the court noted case law stating that a defense attorney could sleep in trial if there is no prejudice. It determined the claim had potential merit, but found defense counsel credible with regard to when she may have closed her eyes. The court stated:

> "Although this isn't a tactical decision or pertaining to trial strategy it is kind of conclusory and misleading. It may be legally immaterial under the case law. For all of those reasons the Court is going to deny the Defendant the right to a new attorney to flush out the issues of ineffective assistance of counsel."

¶ 109   The court then addressed the posttrial motion, denied it, and moved on to the sentencing portion of the hearing. The court noted the filing of the presentence investigation report. Neither

47

party provided additions or corrections to the report. The State noted that it filed a victim impact statement on December 1, 2021. It asked the court to consider that statement and said that it had no additional evidence in aggravation. Defense counsel admitted Defense Exhibit A, which was a letter from Mr. and Mrs. Wimberly, who were family friends of defendant.

¶ 110   The State argued that defendant's criminal history dated back to when he was 14 years old and was convicted of assault and battery, which was a crime of violence. It further noted about a year later, defendant was adjudicated again for home invasion and the same year he was adjudicated for felony unlawful driving away. The State argued it therefore seemed like defendant had a history of violent offenses and then trying to run from police. The State also said that defendant had a history of drug use, starting with cannabis at the age of 12. The State contended such usage of drugs made Mr. and Mrs. Wimberly's letter even more heartbreaking as defendant had a support system at that time. The State further said defendant had two individuals who were willing to help him, and it did not understand why defendant did not take these individuals up on their offer to help.

¶ 111   The State further noted that, as the court was aware based on trial testimony, defendant disposed of the gun in Michigan and sent the police on a wild goose chase to find the gun back in Champaign. The State argued there was concern about the firearm being found by a juvenile or somebody else who was not supposed to have a firearm. It stated, "luckily, nobody else had found it, but the fact that the defendant would just leave the gun for anybody to find, lie to the police is certainly aggravating." The State also argued there were multiple individuals in the house including children. It noted the victim impact statement by Gerryontae's mother showed that Gerryontae's siblings were impacted by this. It noted his mother specifically stated that she remembered her son lying on the floor of the upstairs bedroom and that would have a lasting impact

48

on her. The State argued this was a senseless shooting. The State noted that the sentencing range was 20 to 60 years with a mandatory add-on of 25 years to life imprisonment. The State requested the court sentence defendant to 35 years for the homicide and an additional 25 years for the mandatory add-on.

¶ 112 Defense counsel argued that defendant was just 2½ weeks past his eighteenth birthday when he committed the crime and had an eleventh-grade education. She also stated that defendant had been living in Champaign with his sister after leaving Michigan to start over. Counsel stated she did not believe it was appropriate for the court to consider the one juvenile adjudication about the stolen property receiving or concealing a motor vehicle from March 2019. She also did not believe it was appropriate to consider the other three things listed under additional court involvement in the presentence investigation report, upon which the State relied, because defendant indicated that he believed those things were expunged from his record. Counsel argued that defendant's belief was supported by the information that those orders of guilt were not reported as a conviction for those three cases. Defense counsel noted defendant had no other adult felony convictions and was employed prior to this incident.

¶ 113 Counsel further stated that defendant was diagnosed with anxiety and prescribed medication, including trazodone. Defendant indicated he had taken trazodone for approximately a year then self-medicated by using cannabis. The presentence investigation report also showed that defendant suffered from PTSD although he did not go into detail. Defense counsel noted there was not a lot of statutory mitigation present in this case because of the crime involved. However, counsel asked the court to take into consideration defendant's mental health issues and his age. Defense counsel argued that this was a series of unfortunate events involving young boys trading threats and insults back and forth. Counsel argued by nature of being young, that boys did not

49

always handle situations appropriately as adults would generally handle them. Counsel requested the court impose the minimum of 45 years, 20 years for the offense and the 25-year mandatory add-on.

¶ 114   Defendant provided a statement in allocution apologizing to Gerryontae's family and for his actions. Defendant stated that he would not let his mistakes define him and he would learn and better himself. Defendant advised the court that he felt like he was not given a fair trial, noting his public defender did not produce a single witness or piece of evidence in his favor. Defendant stated counsel failed to provide him with effective assistance by allowing the State to make improper remarks and falling asleep during trial. Defendant requested the court grant him a new trial where he could obtain counsel who would build a defense and defend him to the best of their ability.

¶ 115   The court stated it considered the evidence at trial, the presentence investigation report, the relevant statutory factors and nonstatutory factors, including the nature and circumstances of the offense, the evidence in aggravation and mitigation, defendant's rehabilitative potential, arguments and recommendations of counsel, and defendant's statement in allocution. The court noted it would comment on the factors in aggravation and mitigation that it believed were appropriate.

¶ 116   The court stated there was very little mitigation other than the fact that defendant was 18 years old when the crime was committed. It then said:

> "There is significant aggravation in terms of his prior record. He has the one adult case. He has potential juvenile adjudications from other locations in Michigan. The defense asks that I don't consider those thinking that some of them may be expunged. I'm not aware if they're expunged or not. I'm not going to give great weight to it, but the statute does allow me to consider criminal activity, not

50

just convictions or juvenile adjudications. So I'm going to consider it but not give it much weight, but he does have the prior record."

¶ 117 The court averred it considered the potential harm to other individuals by shooting into a home where defendant knew other people were at risk for potential harm. It also noted the deterrent factor, which was not just to deter defendant from committing crimes like this in the future but to deter others in the community from committing crimes like this. The court noted a statute recently took effect which allowed the court to consider other factors for people under the age of 18. Although such statute did not apply to defendant, the court stated it considered those factors in term of his developmental issues, peer pressure issues, impulsivity issues, and the like. The court stated the victim impact statement was also evidence of aggravation.

¶ 118 The court noted that defendant's background was not unique to him, stating he had a relatively stable upbringing and good relationships. The court stated, "It's sad that young people don't know how to handle disputes anymore. And I truly long for the day of the schoolyard fist fight, but in our society we moved from that to guns quickly." The court stated that defendant was remorseful, which it respected and would give him some benefit, but also noted that defendant complained about his attorney and the defense. The court stated:

"It's sad because [defendant] was raised in an environment around people and in a neighborhood where guns are okay, violence is okay, getting even with people is okay, and that's sad for him.

And it sort of cuts both ways on aggravation and mitigation. I feel sorry for him for being raised in that environment. That's his lifestyle, but it's going to end today for him."

51

¶ 119   The court noted that defendant was almost stalking the kids in the house and when they ran inside, the defendant shot multiple times aimlessly. The court also noted that defendant fled to Michigan, which was something he had done in the past. It again reiterated that it had to send a message to defendant, and the community, that people could not keep committing murders with firearms.

¶ 120   While it stated it was not comparing a previous case "tit for tat, so to speak," the court referred to a prior case involving a different defendant to remain consistent with its sentencing. It noted the previous case involved a 60 years' imprisonment sentence for felony murder. The court noted that unlike that case, the present case involved intentional murder. However, unlike the previous case, defendant here showed some remorse and if it did not "give much weight to the juvenile record here [defendant] may have slightly less of a record than the other individual."

¶ 121   Giving regard to the nature and circumstances of the offense, the history, character, and rehabilitative potential of defendant, the court sentenced defendant to a total of 55 years' imprisonment, which would be 30 years for the murder conviction plus the mandatory firearm enhancement of 25 years. The court noted defendant was to serve 100% of his sentence and was entitled to be up for parole within 20 years with a mandatory supervised release of 3 years.

¶ 122   On December 9, 2021, defendant filed a motion to reconsider the sentence. He argued his sentence was excessive where the court did not give enough consideration to defendant's eleventh-grade education, anxiety, and age of 18. He also argued the court gave too much consideration to deterring others from committing similar crimes. After a hearing on the motion to reconsider occurred on February 11, 2022, the court denied the motion to reconsider, finding the sentence of 55 years' imprisonment was appropriate. Defendant appealed.

¶ 123                                    II. ANALYSIS

¶ 124   On appeal, defendant asserts several issues. He argues that the court erred in granting the State's motion to allow Detective Cherry to remain at the prosecutor's table for the duration of the trial and that Detective Cherry provided improper lay testimony. Defendant also contends the court erred in allowing Paula Moore's hearsay testimony, in failing to appoint *Krankel* counsel, and in relying on its mistaken belief that defendant had a prior adult conviction as an aggravating factor in sentencing. We address each in turn.

¶ 125       A. Detective Cherry's Presence at the State's Counsel Table During Trial

¶ 126   Defendant acknowledges that exclusion of witnesses is not mandatory but argues that a motion to exclude witnesses should normally be allowed and the court should provide some basis for a denial of such motion. *People v. Dixon*, 23 Ill. 2d 136, 137-40 (1961). He disputes that case law prior to the adoption of Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) remains precedential, claiming the court's "interpretation of Rule 615 gives short shrift to the longstanding general rule, incorporated in the rule's first sentence, that trial witnesses should be excluded from the courtroom." Defendant further argues the court erred in finding Detective Cherry was exempted from exclusion as a representative of the State (Ill. R. Evid. 615(2) (eff. Jan. 1, 2011)) because the state's attorney is already the designated representative (Ill. Const. 1970, art. VI, § 19; 55 ILCS 5/3-9005(a)(1) (West Supp. 2021)), and there is no authority that would allow it to designate yet another employee of the county as a second representative.

¶ 127   We addressed the same issue in *People v. Patton*, 2024 IL App (5th) 200399-U, ¶ 98, where we affirmed the trial court's decision to allow the lead investigator to remain in the courtroom at the State's counsel table despite otherwise granting defendant's motion to exclude witnesses. We

53

found allowing the lead investigator to remain at counsel's table to assist "clearly falls under the second category of exemptions" in Rule 615. *Id.* ¶ 95

¶ 128   Rule 615 states:

> "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present." Ill. R. Evid. 615 (eff. Jan. 1, 2011).

¶ 129   In drafting the Rules of Evidence, the committee noted that it incorporated clearly spoken principles of law from Illinois courts "within the last 50 or so years." Ill. R. Evid. Committee Commentary, cmt. 1 (adopted Jan. 1, 2011). The principle that a testifying officer may be present at counsel's table during the entirety of trial absent a showing of prejudice was well established in Illinois law prior to the evidence rules enactment. *People v. Chatman*, 2022 IL App (4th) 210716, ¶ 69 (collecting cases), *aff'd on other grounds*, 2024 IL 129133; see also *People v. Miller*, 26 Ill. 2d 305, 307 (1962).

¶ 130   The evidence rules committee also incorporated all uniformly accepted developments of the Federal Rules of Evidence into the Illinois Rules of Evidence where it would not be in conflict to Illinois law and determined to be beneficial. Ill. R. Evid. Committee Commentary, cmt. 1 (adopted Jan. 1, 2011). Also, because Illinois Rule of Evidence 615 was modeled after Federal Rule of Evidence 615, we may look to the federal rule as guidance. See *Chatman*, 2024 IL 129133, ¶ 37.

¶ 131 As explained in *Patton*, both the Illinois and Federal Rule 615 include a similar exemption for " 'an officer or employee of a party which is not a natural person designated as its representative by its attorney.' " *Patton*, 2024 IL App (5th) 200399-U, ¶ 94 (quoting Ill. R. Evid. 615(2) (eff. Jan. 1, 2011)) (noting Fed. R. Evid. 615(a)(2) (eff. Dec. 1, 2011) uses the language "one officer or employee of a party that is not a natural person if that officer or employee has been designated as the party's representative by its attorney"). Federal case law has held the second category of exemption applies to investigating officers. *Patton*, 2024 IL App (5th) 200399-U, ¶ 94 (collecting cases).

¶ 132 Therefore, based on *Patton* and the Illinois and federal case law cited therein, the trial court here did not err in finding the State's request to have the lead investigator at its table during the entirety of the trial fell under the second category of exemptions in Rule 615. Nevertheless, even where a witness was exempted from exclusion, reversal is warranted if the testimony of the witness who remained in the courtroom during the duration of the trial prejudiced defendant. *In re N.F.*, 2020 IL App (1st) 182427, ¶¶ 32, 36; *Chatman*, 2022 IL App (4th) 210716, ¶ 68.

¶ 133 Defendant here argues he was prejudiced where Detective Cherry's testimony provided an interpretation of key evidence. He further argues his continued presence unfairly bolstered his credibility with the jury.

¶ 134 The allegation that Detective Cherry improperly provided an interpretation of his observations rather than to facts that he had personal knowledge is a separate issue from whether his presence during the trial prejudiced defendant. We discuss whether Detective Cherry provided improper lay testimony in the next section, and in such discussion, it is clear Detective Cherry's testimony was not motivated by previous testimony from other witnesses.

¶ 135   Moreover, we find defendant's argument that Detective Cherry's presence at the State's counsel table bolstered his credibility is a broad, speculative argument that could be made in any case where the lead investigator sits at the State's table and later testifies. Given the numerous Illinois Supreme Court decisions allowing the lead investigator to sit at the State's table despite testifying at trial and interviewing other witnesses (*People v. Leemon*, 66 Ill. 2d 170, 173-74 (1977); *Miller*, 26 Ill. 2d at 307; *People v. Chennault*, 24 Ill. 2d 185, 187-88 (1962); *People v. Dixon*, 23 Ill. 2d 136, 138 (1961); *People v. Strader*, 23 Ill. 2d 13, 23 (1961); *People v. Townsend*, 11 Ill. 2d 30, 47 (1957)), we decline to infer prejudice merely from the officer's presence in the courtroom.

¶ 136                    B. Detective Cherry's Testimony

¶ 137   Defendant also argues that error occurred where Detective Cherry was allowed to provide improper opinion testimony by inferring defendant and Gerryontae were discussing their money dispute in the Facebook messages and speculating about Whitfield's beliefs in making statements to the police. He further contends that Detective Cherry violated the silent witness principle in testifying that the Blink surveillance videos did not show Gerryontae with a gun. Defendant acknowledges all of these issues are forfeited by failing to raise them below. However, he asserts each error constitutes first-prong plain error.

¶ 138   An exception to the forfeiture rule is the plain error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 48. We "examine, substantively, on a rudimentary level, the records before [us] to determine if the claimed errors constitute 'plain' and 'reversible' errors." *People v. Johnson*, 208 Ill. 2d 53, 63 (2003). Under such doctrine, we may excuse defendant's procedural default when a clear and obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the

56

error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. " '[I]f in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.' " *Johnson*, 208 Ill. 2d at 64 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 139 Under the first prong of plain error, defendant bears the burden of showing "the evidence was so closely balanced that 'the error alone severely threatened to tip the scales of justice.' " *People v. Hileman*, 2020 IL App (5th) 170481, ¶ 41 (quoting *Sebby*, 2017 IL 119445, ¶ 51). To determine whether the evidence is closely balanced, we must "conduct a qualitative, commonsense assessment of [the evidence] within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Such inquiry involves an evaluation of the totality of the evidence, including any evidence regarding witness credibility. *Id.* "Absent reversible error, there can be no plain error." *Johnson*, 208 Ill. 2d at 64; see *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 53.

¶ 140 The first step in determining whether plain error applies, however, is determining whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. " '[T]o determine whether a purported error is "plain" requires a substantive look at it.' " *Johnson*, 208 Ill. 2d at 64 (quoting *Keene*, 169 Ill. 2d at 17).

¶ 141 With respect to Detective Cherry's narration of the surveillance video, particularly that Gerryontae is never seen with a gun in the videos, defendant argues his testimony violated the silent witness theory. Defendant contends that Detective Cherry had no personal knowledge of the events and no better ability to analyze the video than the jury to determine whether Gerryontae was holding a gun.

57

¶ 142   When a proper foundation is laid, videotapes may be admitted as substantive evidence. *People v. Taylor*, 2011 IL 110067, ¶ 32. Usually, such evidence is admitted under the silent witness theory, in which "a witness need not testify to the accuracy of the image depicted in the photographic or videotape evidence if the accuracy of the process that produced the evidence is established with an adequate foundation." *Id.*

¶ 143   While defendant frames the issue as regarding the silent witness theory, he is not contesting the foundation of the Blink surveillance videos. Rather, his argument takes issue with Detective Cherry's personal knowledge of the events on the video, which he asserts is an issue of improper lay opinion testimony.

¶ 144   In this respect, the State, citing *People v. Gharrett*, 2016 IL App (4th) 140315, ¶¶ 75-76, and *People v. Mister*, 2016 IL App (4th) 130180-B, ¶¶ 76-77, argues that Detective Cherry's testimony was proper because it was based on his perception of the video and helpful to the jury. It further contends that based on his familiarity with the operation of the Blink surveillance system and this footage, Detective Cherry was more likely than the jury to correctly pinpoint the location and movement of the various individuals.

¶ 145   Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) governs opinion testimony by lay witnesses and states:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

58

¶ 146 However, our supreme court has stated that opinion testimony of a lay witness should be excluded "wherever inferences and conclusions can be drawn by the jury as well as by the witness." (Internal quotation marks omitted.) *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 221 (1985).[1] For example, our supreme court has held that an officer's lay opinion identification testimony is helpful where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (Internal quotation marks omitted.) *People v. Thompson*, 2016 IL 118667, ¶ 41. In making this determination, the Illinois Supreme Court found the following factors relevant: (1) the witness's general level of familiarity with the defendant's appearance; (2) witness's familiarity of the defendant's appearance at the time the video or photograph was taken; (3) whether the defendant disguised his appearance at the time of the offense; (4) whether the defendant altered his appearance prior to trial; and (5) degree of clarity of the surveillance recording and the quality of the subject's depiction in the recording. *Id.* ¶¶ 43-44, 46-48, 51. The court found that the existence of one or more of these factors indicates there is a basis to conclude the witness is more likely to correctly identify the defendant than the jury. *Id.* ¶ 49.

¶ 147 The State's authority, *Gharrett*, 2016 IL App (4th) 140315, ¶ 75, found "most of *Thompson*'s analysis is relevant" to addressing an identification of an object depicted in a surveillance video. In *Gharrett*, defendant was charged—*inter alia*—with burglary of the Illinois Secretary of State Driver's Facility in Clinton. *Id.* ¶ 5. The State admitted surveillance video footage of the Secretary of State's facility. *Id.* ¶ 9. The video showed defendant entering an office without anything in his right hand. *Id.* ¶ 12. A plant obscured the view of what defendant did with

---

[1]*Hamilton* was published before the enactment of the Illinois Rule of Evidence 701. However, our Rule 701 was modeled after the federal counterpart and Illinois courts still look to federal law as guidance to interpret our rule after its enactment. *Mister*, 2016 IL App (4th) 130180-B, ¶ 69 (citing *People v. Thompson*, 2016 IL 118667, ¶¶ 40-49)).

his hand at the desk in the office, but he left the office holding something in his right hand. *Id.* A Secretary of State employee, Paula Maddox, testified that she bundled $303 in cash with checks and placed it in a desk drawer in the office that defendant entered. *Id.* ¶ 14. Paula stated that later that day, the bundle was missing. *Id.* When showed the video, Paula identified the object in defendant's right hand as he left the office as the bundle of cash and checks. *Id.*

¶ 148   The *Gharrett* court found the relevant *Thompson* factors were "(1) the witness's general familiarity with the object; and (2) the clarity of the recording and the extent to which the object is depicted." *Id.* ¶ 77. The court found Paula's testimony was proper as lay opinion testimony where it was based on her perception, her familiarity with the bundle, the video providing only an obstructed view of the defendant at the desk, and the quality of the video. *Id.* ¶¶ 78-79.

¶ 149   The State further relies on *Mister*, 2016 IL App (4th) 130180-B, ¶¶ 76-78, which found a casino employee could identify people, including defendant, and narrate the movement of those people on the casino surveillance video footage. In *Mister*, the victim won over $20,000 at the casino in Peoria, Illinois. *Id.* ¶ 6. Once he arrived at his apartment's parking garage and attempted to exit his car, a male robbed the victim of some of his winnings with a firearm. *Id.* ¶ 8. The male said that he knew the victim had more money and demanded that the victim hand it over. *Id.* The male then headed toward a white or grey car that appeared. *Id.* The male was described as an African American with short, braided hair wearing a dark sweatshirt and dark pants. *Id.* ¶ 9.

¶ 150   A casino employee, James Simmons, testified that he used the 450 cameras in the casino to track movement through the casino. *Id.* ¶ 17. Once he was informed that a casino patron was robbed upon returning home, Simmons reviewed the surveillance footage and observed a white male, wearing a blue jacket, blue jeans, white shoes, and a baseball hat, follow the victim out of the casino and the white male entered a silver four-door sedan. *Id.* ¶ 18. By looking at the

surveillance system located at the security turnstiles—which took still photographs of individuals and their government-issued identification upon entering the casino—Simmons determined the white male was John Williamson. *Id.* Once Simmons was informed a black male carried out the robbery, he followed Williamson's activities at the casino. *Id.* ¶ 19. By reviewing the surveillance videos, Simmons determined that Williamson was with a black male that Simmons identified as Marvino Mister (defendant) based on surveillance system located at the security turnstiles. *Id.* Simmons then identified surveillance videos from numerous cameras both inside and outside of the casino. *Id.* ¶¶ 21-22. Some of the videos had two time stamps, showing the time of the events depicted and the time Simmons viewed the recording. *Id.* ¶ 22. Some portions of the videos had good picture quality, but some were grainy and of poor quality. *Id.* ¶ 22. The State admitted the surveillance videos and still photographs taken from the videos. *Id.* During Simmons's testimony, the State played portions of the surveillance videos and Simmons narrated the events depicted and identified the people in the videos. *Id.* ¶¶ 23-27. Simmons's testimony tracked the movements of Williamson and Mister and concluded that both men arrived at the casino together and left the casino together in the silver car. *Id.* ¶ 27. Once both men were in the car, they circled a nearby hotel parking lot until the victim left the casino parking lot and both cars went to the gas station across the street. *Id.* Williamson and Mister's car then followed the victim's car from the gas station in the direction of the highway. *Id.*

¶ 151    The *Mister* court determined Simmons's testimony was rationally based on his perception. *Id.* ¶ 76. It further found his testimony was helpful where the videos contained nearly four hours of footage, lacked clarity, was difficult to assess, and involved fluid scenes and numerous individuals and vehicles. *Id.* ¶ 77. The court stated:

61

"One would likely miss certain details considering the wide array of events captured by surveillance cameras located throughout the casino and parking lots. Simmons acknowledged he had to view the videotape a 'few times' before identifying a black male as a possible suspect. To have the jury do likewise would be an extremely inefficient use of the jury's and the court's time." *Id.*

It also reasoned that the purpose of Simmons's testimony was to determine whether the black male left in the same car as the white male, which followed the victim's car. *Id.* Simmons did not identify either male as defendant, but stated the names as presented on their identification. *Id.*

¶ 152 We find *Thompson*, *Gharrett*, and *Mister* distinguishable. Notably, all of those cases involved identification of a person or object present in the video. Here, Detective Cherry testified to the absence of an object, *i.e.*, an undescribed firearm. Without an object or person to observe, much of the *Thompson* analysis is not applicable.

¶ 153 While the surveillance videos were broken into several separate segments with multiple individuals coming in and out of view, Detective Cherry's testimony was helpful only to the extent that he identified the individuals in each clip and the specific time of each clip. However, the pivotal issue here did not necessarily require tracking the movement of the people in the house; rather, the issue was whether anyone in the house possessed a gun or an object that looked like a gun. Unlike the State's authority, based on the still photos taken from the surveillance videos, the clips here were simple and clear enough for the jury to determine if Gerryontae or another person at the house was holding a gun or another object. As such, we find Detective Cherry was in no better position to correctly opine as to the absence of a firearm than the jury and therefore provided improper lay opinion testimony which was an error. *Hamilton*, 108 Ill. 2d at 221 (lay opinion testimony should be excluded "wherever inferences and conclusions can be drawn by the jury as

well as by the witness" (internal quotation marks omitted)); *Thompson*, 2016 IL 118667, ¶ 41 (lay opinion identification testimony is only helpful where "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury" (internal quotation marks omitted)).

¶ 154 In arguing for first-prong plain error, defendant does not discuss the other evidence presented at the trial. Instead, he contends such error constitutes plain error because Detective Cherry's testimony added additional weight to the State's theory that no one in the home had a weapon and Detective Cherry telling the jurors that he had watched the videos multiple times suggested that he was in a better position than they to interpret what they showed. He argues that Detective Cherry's testimony that Gerryontae did not have a gun or gun-like object also took the jury's attention away from the fact that the video did not record the moments before and after Gerryontae was shot. We disagree.

¶ 155 Detective Cherry admitted that there was no recording of the time immediately before or after the shooting. Defendant does not contend that Detective Cherry misrepresented what was on the video. Moreover, absent Detective Cherry's testimony, several witnesses testified that Gerryontae and everyone else in the home did not have a weapon. The evidence also showed there was no indication that firearms were discharged from inside the house, firearms were located in the house, or that there were other bullet casings than those fired from defendant's gun. We therefore find Detective Cherry's testimony in this regard does not amount to reversal or plain error. See *People v. Sims*, 192 Ill. 2d 592, 629 (2000) (an error that is harmless is not reversible and therefore does not amount to plain error).

¶ 156 Defendant next argues that it was plain error for Detective Cherry to testify as to the meaning of the Facebook messages between defendant and Gerryontae and Whitfield's beliefs

during his statement to police. Defendant contends by interpreting the Facebook messages, Detective Cherry suggested a motive for the shooting.

¶ 157   Even assuming that Detective Cherry's statement that the Facebook messages discussed the money dispute was improper, we fail to see how this prejudiced defendant. Detective Cherry in no way implied that defendant sought retaliation for the dispute. His testimony provided nothing more than Kimora Douglas and defendant's testimony about the same dispute between defendant and Gerryontae. In fact, defendant testified that the messages regarded the money dispute and that Detective Cherry's testimony regarding the messages was truthful. This testimony was therefore duplicative and not prejudicial. Accordingly, Detective Cherry's testimony about the Facebook messages does not amount to reversible or plain error. See *id.* (an error that is harmless is not reversible and therefore does not amount to plain error).

¶ 158   Defendant's last claim of improper lay testimony concerns the State's cross-examination of Detective Cherry during the defense's case-in-chief. He argues Detective Cherry improperly speculated about Whitfield's beliefs during his police interview in an attempt to reconcile the inconsistencies between Whitfield's statement to police and his trial testimony. We first note that defense counsel raised the issue of Whitfield's statements to police during its direct examination of Detective Cherry in its case-in-chief. Defense counsel asked if Detective Cherry heard Whitfield's testimony and if there were inconsistencies with Whitfield's statements to police. Detective Cherry answered affirmatively. Defense counsel then played several clips of Whitfield's police interview, including Whitfield stating that although it was dark, he saw someone with a long shadowy figure that looked like it could have been a gun, and that other people were shooting back at defendant and him.

¶ 159   It is not clear from the record that when asked if Whitfield provided any further clarification of those statements during his interview, Detective Cherry did anything more than simply recount Whitfield's own explanation provided later in the interview. We note that under the completeness doctrine, the State could present evidence of Whitfield's other statements given on the same subject at the same time that would shed light on the meaning of the evidence presented by defense counsel. *People v. Patterson*, 154 Ill. 2d 414, 453 (1992). While Detective Cherry did not recount Whitfield's statements verbatim, there was no interpretation as to what Whitfield meant. Rather Detective Cherry stated that he asked Whitfield some clarifying questions as to why Whitfield believed someone at the house shot back or had a gun and then Detective Cherry testified as to Whitfield's answers to those questions. As such, it is not clear that Detective Cherry's testimony in this regard was his opinion or interpretation of Whitfield's statements, rather than his observation of what Whitfield said. Defendant also does not allege that Detective Cherry's recount of Whitfield's statements was incorrect. Thus, Detective Cherry's testimony in this regard was not clear error, and without error, there can be no plain error.

¶ 160   Defendant also asserted counsel was ineffective for failing to raise all these issues. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. The failure to establish either prong of *Strickland* precludes a finding of ineffectiveness. *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 161 As stated above, with respect to Detective Cherry's testimony regarding the Facebook messages and Blink Ring videos, defendant failed to establish prejudice under the first prong of plain error. Accordingly, defendant could not establish the prejudice required for an ineffective assistance claim under *Strickland*. *People v. Williams*, 2022 IL App (2d) 200455, ¶ 122 ("defendant's claim of ineffective assistance of trial counsel is meritless where, as here, he cannot show that he was prejudiced under first-prong plain-error analysis" (citing *People v. White*, 2011 IL 109689, ¶¶ 133-34)); *People v. Glasper*, 234 Ill. 2d 173, 215-16 (2009).

¶ 162 We further find defendant failed to establish ineffective assistance of counsel regarding any failure to object to Detective Cherry's testimony regarding Whitfield's statements during his interview. To succeed in showing that counsel was ineffective in this respect, defendant had the burden of proving that Detective Cherry's testimony was actually an interpretation of Whitfield's statements rather than a recitation of Whitfield's statements. Defendant fails to allege, let alone demonstrate, that Detective Cherry misconstrued what Whitfield said during his interview. Therefore, defendant's assertion of ineffective assistance of counsel on this basis fails.

¶ 163                    C. Paula Moore's Hearsay Testimony

¶ 164 Defendant also argues that a new trial is warranted where Paula made several inadmissible hearsay statements. The sixth amendment guarantees that " '[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him.' " *People v. Lofton*, 194 Ill. 2d 40, 53 (2000) (quoting U.S. Const., amend. VI). "[T]he basic objective of the Confrontation Clause *** is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). " 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted ***.' " *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002) (quoting *People v.*

66

*Olinger*, 176 Ill. 2d 326, 357 (1997)). The confrontation clause prohibits the use of hearsay evidence unless the evidence is a "firmly rooted hearsay exception or particularized guarantees of trustworthiness assure the reliability of the evidence." *People v. McClanahan*, 191 Ill. 2d 127, 132 (2000).

¶ 165    Paula testified to several out-of-courtroom statements that Gerryontae made to her during their previous conversations. The State offered the statements as truth for the matter asserted and did not argue any hearsay exception was applicable. Indeed, on appeal, the State concedes that Paula made hearsay statements regarding: (1) the money dispute between Gerryontae and defendant, (2) defendant's videos threatening Gerryontae, (3) whether Gerryontae possessed a firearm or wanted to harm defendant, and (4) defendant's statement that he was only worried about a physical altercation with Gerryontae. However, the State argues that these errors were harmless. We agree.

¶ 166    To establish harmless error, "the State must prove beyond a reasonable doubt that the result would have been the same absent the error." *People v. Jackson*, 2020 IL 124112, ¶ 127. In other words, "we determine whether the outcome would have been the same regardless of the error." *People v. Stoecker*, 2019 IL App (3d) 160781, ¶ 11; *People v. Traina*, 230 Ill. App. 3d 149, 154 (1992). We consider "the proceedings as a whole, based upon examination of the entire record." *People v. Mullins*, 242 Ill. 2d 1, 23 (2011). In such cases of evidentiary error, the Illinois Supreme Court has "recognized three approaches to determine whether an error such as this is harmless beyond a reasonable doubt: (1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative." *People v. King*, 2020 IL 123926, ¶ 40.

¶ 167   Paula's testimony regarding the money dispute is duplicative of other evidence and the general fact that defendant had a gun is also duplicative of other evidence. Kimora and defendant both testified to the dispute and to defendant having a gun. Moreover, by claiming self-defense, defendant necessarily conceded he had a gun. See *People v. Raess*, 146 Ill. App. 3d 384, 391 (1986) ("the raising of [self] defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted"). Therefore, such evidence did not harm defendant.

¶ 168   Paula's testimony regarding her own out-of-court statements that Gerryontae did not have a gun is also harmless. Paula's statement that Gerryontae did not have a gun during a conversation a few days before the shooting has little bearing on whether Gerryontae possessed a gun on the day of the shooting. Even if such inference was reasonable, it would have been duplicative of several of the other witnesses who testified that Gerryontae did not have a gun.

¶ 169   Paula's testimony that defendant threatened Gerryontae by sending him videos of defendant brandishing a gun is not duplicative of other evidence at trial. However, we find there was overwhelming evidence of defendant's guilt where defendant intentionally went to Gerryontae's house, fired multiple shots into the house, and there was no evidence—except for defendant's testimony—indicating something warranted defendant to believe he needed to act in self-defense. Multiple witnesses testified that Gerryontae and his friends were all in the house, away from defendant, and no one in the house had weapons. Moreover, there was no evidence that firearms were discharged from inside the house, firearms were located in the house, or that there were other bullet casings than those fired from defendant's gun. Accordingly, we find the result would have been the same absent Paula's hearsay testimony that defendant threatened Gerryontae.

¶ 170                          D. *Krankel* Counsel

¶ 171  Defendant also argues the court erred in failing to appoint *Krankel* counsel to represent him on four of his posttrial ineffective assistance of counsel claims. The Illinois Supreme Court's decision, in *People v. Krankel*, 102 Ill. 2d 181 (1984), developed a common-law procedure to address *pro se* posttrial claims of ineffective assistance of counsel. *In re Johnathan T.*, 2022 IL 127222, ¶ 23. "This procedure allows the trial court to decide whether independent counsel is necessary to argue a defendant's *pro se* posttrial ineffective assistance claims at a full *Krankel* [evidentiary] hearing." *Id.*

¶ 172  New counsel is not automatically appointed. *People v. Jolly*, 2014 IL 117142, ¶ 29. Rather, the trial court must determine whether defendant's *pro se* allegations show possible neglect of his case. *Jackson*, 2020 IL 124112, ¶ 97. If the court finds the claims pertain to matters of trial strategy or lack merit, it need not appoint new counsel. *Id.* However, if the allegations show possible neglect, new counsel should be appointed to independently evaluate defendant's *pro se* claims and represent defendant at the hearing on the *pro se* claims of ineffective assistance of counsel. *Id.*

¶ 173  In conducting this evaluation, the trial court may inquire into the facts and circumstances of the alleged ineffective assistance from counsel or defendant. *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 29. The court can base its determination on "its knowledge of the defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* Defendant need only raise a colorable claim of ineffective assistance of counsel during the preliminary *Krankel* hearing to warrant further proceedings. See *People v. Cook*, 2018 IL App (1st) 142134, ¶ 104. We review the court's preliminary *Krankel* hearing determination for a manifest error. *Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

69

¶ 174                              i. *Motion to Suppress Claim*

¶ 175   First, defendant claims that counsel was ineffective for failing to file a motion to suppress his statements on the basis that Detective Cherry ignored defendant's invocation of his right to counsel. Defense counsel averred she could not suppress a statement that defendant would then testify about. The court agreed, finding the claim lacked merit where defendant's testimony would be the same as the statements in the video.

¶ 176   On appeal, defendant contends it is well established that when a defendant invokes his right to counsel during a custodial interview, questioning should end, and counsel be provided. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). He states in the motion to suppress that was later withdrawn, counsel noted that defendant clearly invoked his right to counsel during his custodial interrogation with Detective Cherry when he said, "can I have a lawyer in here?" and "is there any lawyers available right now? Like lawyers that can sit in here with me?" but Detective Cherry did not honor his request. Thus, the motion had merit. Defendant further argues that the record shows counsel's decision to withdraw the motion to suppress was based upon her incorrect belief that defendant would not be able to testify in his own defense if the statement were suppressed. However, suppression of his statements would not have prevented defendant from testifying about the shooting. See *People v. Sanders*, 2021 IL App (5th) 180339, ¶ 36. Defendant contends had the motion been filed and granted, he would have been spared the prejudice of the jury seeing him in an interrogation cell, while under the influence of drugs. Moreover, defendant argues that the statements also may not have been used as impeachment evidence because the State cannot use involuntary statements as impeachment (*id.* ¶ 41) and defendant raised the involuntariness of his statement based on the influence of drugs in his motion.

¶ 177 Assuming, *arguendo*, that the motion to suppress would have been granted based on violation of defendant's right to counsel, we find defendant failed to show potential prejudice. Defendant concedes that his trial testimony was consistent in most material respects with his statement to police. Defendant claims that he was prejudiced by the jury seeing him in an interrogation cell while under the influence, but he provided no authority for this proposition. Nevertheless, the presence in an interrogation cell does not provide an additional damning perception of defendant as the jury already knew defendant was a suspect in this case by being on trial and there was other evidence—including defendant's testimony—indicating he took drugs.

¶ 178 Defendant also argues prejudice existed where the State may not have been able to use the video as impeachment evidence either because his motion to suppress also contended not all his statements were involuntary. *Id.* (involuntary statements cannot be used as impeachment evidence). Defendant, however, failed to argue counsel should have filed a motion to suppress or argue prejudice on this basis during the *Krankel* hearing and therefore forfeited this contention on appeal. *People v. Green*, 2024 IL App (2d) 220328, ¶ 57. Defendant cannot complain on appeal the trial court's decision not to appoint counsel was manifestly erroneous based on a claim of ineffectiveness he did not present to the court.

¶ 179 Without showing possible prejudice, there is no possible ineffective assistance claim regarding the motion to suppress. See *People v. Enis*, 194 Ill. 2d 361, 377 (2000) ("The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel."). The court therefore did not manifestly error regarding this claim.

¶ 180                    ii. *Counsel Fell Asleep Claim*

¶ 181   Defendant next claims the court should have appointed *Krankel* counsel for his claim that counsel was ineffective for falling asleep. While trial counsel did not dispute defendant's claim, defendant fails to even vaguely explain how he was prejudiced by counsel possibly being asleep. Rather, he relies on the presumption of prejudice in *United States v. Cronic*, 466 U.S. 648, 656-57 (1984). *Cronic*, however, applies only where there was no adversarial testing from counsel throughout the proceeding as a whole (*People v. Cherry*, 2016 IL 118728, ¶ 26),[2] which clearly did not happen here. Moreover, defendant was represented by two public defenders and there is no allegation that both were asleep. The trial court therefore did not manifestly error in declining to appoint *Krankel* counsel for this claim.

¶ 182                 iii. *Failing to Call James Mann as Witness Claim*

¶ 183   Defendant also claims the court should have appointed *Krankel* counsel for his claim that counsel was ineffective for failing to call James Mann as a witness. Defense counsel stated that based on her reading of the police report, Mann would not have added anything to the defense's trial strategy. The trial court found such decision a matter of trial strategy.

¶ 184   Whether to call a witness is generally a matter of trial strategy, but counsel may be ineffective for failing " 'to call witnesses whose testimony would support an otherwise uncorroborated defense.' " *People v. Bryant*, 391 Ill. App. 3d 228, 238 (2009) (quoting *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999)). Moreover, counsel has a duty to reasonably investigate, including an independent investigation of possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. According to counsel here, Mann indicated "that he believed there might have been more

---

[2]*Chronic* prejudice presumption also applies when counsel is denied at a critical stage or counsel is called to represent a client in circumstances under which no attorney could provide effective assistance. *Cherry*, 2016 IL 118728, ¶ 25. However, defendant does not claim either of those situations occurred here.

than one shooter when the initial rounds were fired and nothing after the fact." It is possible Mann was referring to additional person shooting at the house, but Mann could have also intended that someone from the house fired a gun as well. If Mann meant the latter, such testimony could provide corroboration to defendant's theory that people at the house had guns. Due to the statement's ambiguity, counsel could not have made a strategic decision without further investigation of Mann's statement or interviewing Mann. *People v. Bell*, 152 Ill. App. 3d 1007, 1012-13 (1987) ("Without having thoroughly interviewed all of the potential witnesses about the events leading up to the Bells' murders, it was impossible for counsel to determine that their testimony would have been worthless or inconsistent with the theory of self-defense."). We therefore find that defendant presented a possible claim of ineffectiveness in this regard, and the court manifestly erred in failing to appoint *Krankel* counsel to further investigate.

¶ 185    iv. *Failing to Admit Pictures of the Victim Holding Guns Claim*

¶ 186   Lastly, defendant claims the court should have appointed *Krankel* counsel for his claim that counsel provided ineffective assistance by failing to admit pictures of Gerryontae holding guns. Counsel asserted, and the court found, such decision was a matter of trial strategy where the court previously warned counsel that doing so could open the door for the State to admit pictures of defendant holding guns.

¶ 187   The defense's theory of self-defense centered around whether the victim had a gun or defendant believed the victim had a gun. Pictures of the victim with a gun would support this fact and contradict some of the State's witnesses regarding whether the victim possessed guns. While the court averred such admission would open the door for the State to admit similar photos of defendant, defendant testified to having a gun and the defense's theory at trial necessarily involved an admission that defendant had and fired a gun. See *Raess*, 146 Ill. App. 3d at 391 ("the raising

73

of [self] defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted"). Moreover, Paula's testimony during the State's case-in-chief had already provided evidence that defendant had guns and threatened Gerryontae while holding a gun. Accordingly, it is possible that counsel's decision to not present this evidence could be unreasonable trial strategy, as there was potentially minimal prejudice from a picture of defendant with a gun where such evidence would not have provided the jury with any new or disputed information, while a picture of Gerryontae with a gun could have had potential upside in supporting the defense's trial theory. Accordingly, defendant demonstrated possible neglect, and the court erred in failing to appoint *Krankel* counsel for this claim.

¶ 188                    D. Consideration of Adult Conviction in Sentencing

¶ 189   Defendant lastly contends the court erred in relying on its mistaken belief that defendant had an adult criminal record in fashioning his sentence. This issue, however, is forfeited where defendant failed to argue it before the trial court. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required"). Defendant asserts this issue can be reviewed for plain error.

¶ 190   As noted above, plain error allows this court to consider forfeited errors that are clear, obvious, and affect substantial rights. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). In the sentencing context, defendant must show there was clear and obvious error and "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. Defendant has the burden of persuasion under both prongs of plain error and the failure to meet the burden results in honoring the procedural

74

default. *Id.* Under both prongs of the plain error doctrine, defendant must first show a clear and obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 191   A court has great deference to sentence a defendant to any sentencing term within the prescribed statutory range, "[a]s long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors." *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990). " '[A] trial court abuses its discretion when it considers an improper factor not supported by the evidence or fails to consider all of the statutory factors in aggravation and mitigation.' " *People v. Banks*, 213 Ill. App. 3d 205, 215 (1991) (quoting *People v. Glass*, 144 Ill. App. 3d 296, 303 (1986)). To be entitled to resentencing, a defendant "bears the burden of showing that the trial judge relied upon the improper factor in fashioning the defendant's sentence." *People v. Brown*, 2019 IL App (5th) 160329, ¶ 18.

¶ 192   Here, the court commented that there was "significant aggravation" in terms of defendant's criminal history, specifically noting defendant had "one adult case" and several juvenile adjudications from other jurisdictions. While its comment focused on defendant's criminal history generally rather than any particular conviction, it also expressly noted that it was not giving much weight to the juvenile record. Taking the court at its word in giving the juvenile cases little weight, it could have only found the adult case was a factor in aggravation. Indeed, when the court compared this case to a previous case before it, the court stated that, "if I don't give much weight to the juvenile record here [defendant] may have slightly less of a record than the other individual." However, the record shows defendant's criminal record contained only juvenile cases. Thus, the court erred by improperly relying on an adult criminal record that was not supported by the record. See *People v. Hammock*, 68 Ill. App. 3d 34, 43 (1979) (court considering facts not supported by

75

record was an improper factor to consider during sentencing); *People v. Reed*, 298 Ill. App. 3d 285, 305 (1998) (same).

¶ 193   The question thus becomes whether the evidence at the sentencing was closely balanced, or whether the error was so egregious as to deny the defendant a fair sentencing hearing. Defendant fails to explicitly argue for either prong of plain error. In his opening brief, he cites to *People v. Whitney*, 297 Ill. App. 3d 965, 969 (1988), which found the court considering an aggravating factor not supported by the record was second-prong plain error. However, the Illinois Supreme Court recently held, in *People v. Johnson*, 2024 IL 130191, ¶¶ 91-92, that a court error in considering an improper aggravating factor is not amendable to second-prong plain error. Thus, any attempt to assert second-prong plain error here is unsuccessful. Moreover, defendant failed to present any argument or authority that the error here constitutes first-prong plain error and thus forfeits such argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."). Because defendant failed to establish either prong of plain error, we honor the procedural default of the issue.

¶ 194                                          III. CONCLUSION

¶ 195   The trial court did not err in allowing Detective Cherry to remain in the courtroom and at the prosecutor's table. While hearsay testimony was improperly admitted at trial, such error was harmless. Defendant failed to establish plain error regarding Detective Cherry's testimony and the trial court's consideration of an improper aggravating factor. However, the trial court manifestly erred in failing to appoint *Krankel* counsel to investigate defendant's *pro se* posttrial ineffectiveness claims regarding counsel's failure to call James Mann as a witness and admit photos of Gerryontae with guns. Accordingly, we affirm the judgment and sentence but remand for further *Krankel* proceedings.

¶ 196   Affirmed and remanded with directions.